UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JERRY COVIELLO,          ) | |
|      Plaintiff,       ) | |
|                 ) | |
| V.                  ) | C.A. NO.:  04 11901 MLW |
|                 ) | |
| TOWN OF CHELSMFORD, et al  ) | |

**DEFENDANTS JENNIFER FAY, GARY HANNAGAN, JAMES SPINNEY, FRANK ROARKE, SCOTT UBELE, BERNARD LYNCH, RAYMOND MCCUSKER AND THE TOWN OF CHELSFORD'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56.1 IN SUPPORT OF THE DEFENDANTS' SUMMARY JUDGMENT**

The defendants Jennifer Fay ('Fay"), Gary Hannagan ("Hannagan"), James Spinney ("Spinney"), Frank Roarke ("Roarke"), Scott Ubele ("Ubele"), Bernard Lynch ("Lynch"), Raymond McCusker ("McCusker") and the Town of Chelmsford, submit the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

For purposes of this Summary Judgment **only**, the defendants state as follows:

1.	This action arises out of a motor vehicle stop of the plaintiff, Gerald Coviello ("plaintiff") by the Chelsford Police on September 1, 2001.  **(See Plaintiff's Complaint)**.

2.	Prior to the motor vehicle stop, the plaintiff was at the Hong Kong restaurant in Chelmsford.   **(See plaintiff's deposition attached as Exhibit 1 at p. 23)**.

3.	Prior to arriving at the Hong Kong restaurant, the plaintiff was at the Barking Crab in Boston where he consumed a drink or a beer. **(See criminal trial transcript attached as Exhibit 2 at pp. 50-51)**.

4.	While at the Hong Kong,  the plaintiff had 2 or 3 glasses of wine. **(Exhibit 1 at p. 23)**.

5.	An acquaintance of the plaintiff's, Richard Fries ("Fries") was also at the Hong Kong on the night of the incident and the plaintiff offered to drive Fries home because he had too much to drink. **(Exhibit 1 at p. 25 and deposition of Richard Fries attached as Exhibit 3 at pp. 31-37, 42)**.

6.      The plaintiff and Fries left the Hong Kong at approximately 12:00 a.m. **(Exhibit 1 at p. 28)**.

7.      As they were leaving the Hong Kong, Fries made inappropriate comments or a pass at Chelmsford Police Officer Fay who was working a detail at the Hong Kong.  **(Exhibit 1 at pp. 29-30)**.

8.      Fay did not call the Chelmsford Police dispatcher or anyone else to report Fries' comments and only left her detail at the Hong Kong to assist with traffic later that night.  **(See Jennifer (Fay) Bellissimo Answers to Interrogatories attached as Exhibit** 4).

9.      Fay never asked anyone to stop or pull the plaintiff over.   **(Exhibit 4)**.

10.     The Chelmsford Police Department was conducting selective traffic enforcement between 10 p.m. on August 31, 2001 and 2:00 a.m. on September 1, 2001 between the Vinal Square area in North Chelmsford and the Drum Hill Road area, as it was a holiday weekend**.  (See Lieutenant James Spinney's report attached as Exhibit 5)**.

11.     After leaving Hong Kong in plaintiff's 1967 Ford Mustang the plaintiff took a right onto Chelmsford Street.  **(Exhibit 1 at pp. 28, 31-32)**.  He passed a police cruiser that was sitting in a parking lot with its blue lights on.  **(Exhibit 1 at p. 32)**.

12.     The plaintiff traveled approximately 100 feet on Chelmsford Street when the cruiser that he had passed pulled out behind him and pulled him over. **(Exhibit 1 at pp. 32-33)**.

13.     The plaintiff was pulled over by Chelmsford Police Officer Michael Horan ("Horan") because of a defective rear driver's taillight and a defective exhaust. As the plaintiff was pulling over Horan observed the plaintiff drift across the double yellow line of Chelmsford Street.  **(See narrative report of Michael Horan attached as Exhibit 6)**.

14.     Horan was not aware of any transmission from Fay or anyone else about stopping the plaintiff's car.  **(See Michael Horan's Answers to Interrogatories attached as Exhibit 7)**.

15.     While the plaintiff was speaking with the police, his car window was down approximately five inches, enough for a police officer to get his arm into the window, but Fries' window was up. **(Exhibit 2 at pp. 47 and 60)**.

16.     Horan asked the plaintiff for his license which he produced.  **(Exhibit 1 at p. 35 and Exhibit 6)**.  Horan advised the plaintiff he stopped him because of a defective taillight and exhaust.  **(Exhibit 6)**.  The plaintiff denied there was any problem with his vehicle.[1]  **(Exhibit 6)**.

17.     While Horan was speaking with the plaintiff, he smelled a strong odor of alcohol coming from the plaintiff's vehicle.  **(Exhibit 6)**.  Officer Horan asked the plaintiff if he had any alcohol that evening and plaintiff replied that the had a couple of beers.  **(Exhibit 6)**.

18.     Horan asked the plaintiff to turn off his vehicle.  The plaintiff replied that he could not because it would not restart. **(Exhibit 1 at p. 36 and Exhibit 6)**.

19**.**     Horan told the plaintiff to shut the car off and if it did not start they could jump start the car but he still refused to turn off his vehicle. **(Exhibit 2 at pp. 55-56 and Exhibit 6)**.

20.     Lieutenant Spinney stopped to assist Horan.  (**See Narrative Report of James Spinney attached as Exhibit 9).**

21.     Spinney was not aware of any transmission from Officer Fay or anyone else about stopping the plaintiff's car.  **(See James Spinney's Answers to Interrogatories attached as Exhibit 10)**.

22.     Spinney told the plaintiff to exit the vehicle after he refused to turn the vehicle off. The plaintiff refused.  **(Exhibit 6 and Exhibit 9)**.

23.     According to the plaintiff, after he was told to get out of the car by Horan, Spinney put his arm into the car and attempted to grab either his keys or the steering wheel. **(Exhibit 1 at pp.38-39)**.   Mr. Fries also observed an officer reach in plaintiff's vehicle in an attempt to turn off the vehicle.  **(Exhibit 3 at p. 44)**.

 24.     The plaintiff alleges that Horan then grabbed his head, banged it and pulled his hair.  **(Exhibit 1 at pp. 38-39)**.

25.     The plaintiff did a three-point turn and took off in his car at a high rate of speed, causing the police officers to jump out of the way. **(Exhibit 2 at pp. 13-15)**.

26.     While on patrol, Officer Hannagan observed Horan stop a blue

---

[1] The plaintiff's mother asked a friend, Lillian Clark, to look at plaintiff's car to determine if plaintiff's vehicle had a defective taillight. **(See deposition of Lillian Clark attached as Exhibit 8 at pp. 11-12)**.  Ms. Clark has no training or experience with motor vehicles other than working on her own vehicle.  **(Exhibit 8 at pp. 9-10)**.  A day or two after this incident, Ms. Clark examined the plaintiff's car by putting the key on accessory to determine if all the lights were working. She did not turn the engine on or drive the car.  **(Exhibit 8 at p. 12-16)**.

Mustang on Chelmsford Street and stopped to assist him. **(See Narrative Report of Officer Gary Hannagan attached as Exhibit 11)**.

27.     Hannagan was not aware of any transmission from Fay or anyone else about stopping the plaintiff's car. **(See Gary Hannagan's Answers to Interrogatories attached as Exhibit 12)**.

28.     Horan informed Hannagan that he stopped the plaintiff's vehicle for a defective taillight and a loud muffler. Horan also advised Hannagan that he observed the plaintiff cross over the solid double yellow lines on several occasions. **(Exhibit 11).**

29.     While Horan was speaking with the plaintiff, Hannagan made contact with Mr. Fries who advised that they had just come from the Hong Kong. **(Exhibit 11).**

30.     Hannagan heard Horan and Spinney ask the plaintiff to roll his window down further and plaintiff replied that it would not go down any further as he rolled it down more. **(Exhibit 11)**.

31.     Hannagan also heard Horan ask the plaintiff to turn his vehicle off and plaintiff replied that he could not as it would die. **(Exhibit 11)**. Hannagan heard Horan inform the plaintiff that they could get cables if that happened and at that point the plaintiff hit the gas and left the scene. **(Exhibit 11)**.

32.     The plaintiff believes he was pulled over because Fay was upset about the pass made by Fries and that she reported the incident to the dispatcher but he did not observe Fay do anything in response to Fries' remarks and did not see her use her radio. **(Exhibit 1 at pp. 30, 61-62)**.

33.     The plaintiff proceeded to his home on Steadman Street at a high rate of speed where he had a cache of weapons. **(Exhibit 1 at pp. 39-40, 51-54)**.

34.     After arriving at his home on Steadman Street, the plaintiff ran in the back door. **(Exhibit1 at p. 48)**. A police officer came to the door and when his mother asked what the problem was she was told to open the door, an officer pointed a gun at her. **(Exhibit 1 at p. 50)**. His mother instructed him to call the police which he did and then he went upstairs to retrieve a sawed off shotgun from his bedroom to confront the officer who had pointed the gun at his mother. **(Exhibit 1 at pp. 51, 56)**.

35.     A stand off with police took place for several hours **(Exhibit 1 at p. 59)**.

36.     The plaintiff was arrested on various charges including, leaving the scene, failure to stop for a police officer, assault upon Hannagan by use of a motor vehicle, multiple counts of assault by means of a firearm and for possession of firearms and incendiary device. Probable cause was found and the plaintiff was indicted on the assault and weapons charges. **(See booking report, Probable Cause Determination and Indictments attached as Exhibit 13)**.

37.     The plaintiff hired an investigator who was allegedly told by the Hong Kong maitre d', Mr. Ming Yui Moy ("Moy") that he saw Fay use her radio after he and Fries got into his car in the Hong Kong parking lot.  **(Exhibit 1 at pp. 61-62)**.

38.     Moy testified at his deposition that he did not see Fay use her radio on the date of the incident and denied that he ever had a conversation with an investigator in which he said he saw Officer Fay use her radio. **(See deposition Ming Yui Moy attached at Exhibit 14 at pp. 16-18)**.

39.     The police transmissions of the night of the incident do not include any calls by Officer Fay to the Chelmsford Police Department.  **(See Chelmsford Police dispatch tape and CD-rom attached as Exhibit 15)**.

40.     The plaintiff claims the tapes were edited by the defendants to delete the transmissions by Fay. **(Exhibit 1 at p. 36)**.   Plaintiff also claims the CD Rom copy was manipulated by then Lieutenant Scott Ubele for the same reason. **(Exhibit 1 at p. 88)**.

41.     The defendants deny that any transmission was received from Fay or anyone else regarding stopping the plaintiff's vehicle or that any recording of any transmissions on the night in question were edited, deleted or manipulated. **(See Exhibits 4,7, 10 and 12 and Defendants Ubele and Roarke's Answers to Interrogatories attached as Exhibits 16 and 17)**.

42.     The plaintiff has identified Zed McLarnon ("McLarnon") as an expert who will testify that the police transmissions on the night of the incident were edited and manipulated. (**See McLarnon resume and report attached as Exhibits 18 and 19).**

43.     McLarnon is a plaintiff in a Federal Court action in which he accused various Massachusetts Court employees of editing hearing tapes to delete information that was harmful to his ex-wife and helpful to him**.  (See copy of Complaint and articles relating to McLarnon's claims attached as Exhibit 20)**.

44.      Part of McLarnon's opinion is based upon the investigator's report that Mr. Moy told him he saw Officer Fay use her radio after the plaintiff left the Hong Kong. **(Exhibit 19)**.

45.     According to the defendants' expert Kathleen Redlund ("Redlund"), the tape and CD Rom were not manipulated or edited and it is impossible to do so. **(See Affidavit of Kathleen Redlund attached as Exhibit 21)**.

46.    The plaintiff brought a civil action against Officer Horan for assault and battery arising out of this incident in the Lowell District Court that resulted in a judgment against Officer Horan that has been satisfied.  (**See Officer Horan's Motion for Summary Judgment and attached Exhibits).**

Respectfully submitted,

The defendants,
By their attorneys,

___/s/ Jeremy Silverfine_____
Jeremy I. Silverfine, BBO#542779
Leonard H. Kesten, BBO#542042
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 880-7100

Date:  3-2-07