# EXHIBIT 8

VOL. 1 - 1
LILLIAN CLARK

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 04-11901-MLW

-------------------------------------------
                                              )
JERRY COVIELLO,                               )
     Plaintiff,                               )
                                              )
          vs.                                 )
                                              )
TOWN OF CHELMSFORD,                           )
CHELMSFORD POLICE DEPARTMENT, ET AL.,         )
     Defendants.                              )
                                              )
-------------------------------------------


       DEPOSITION OF LILLIAN CLARK, taken on

behalf of the Defendant, pursuant to the applicable

provisions of the Massachusetts Rules of Civil

Procedure, before June N. Poirier, Shorthand Reporter

and Notary Public within and for the Commonwealth of

Massachusetts, at the Chelmsford Police Station,

One Olde North Road, Chelmsford, Massachusetts,

on Wednesday, September 28, 2005, commencing

at 12:20 p.m.


       DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
                    One State Street
            Boston, Massachusetts 02109
                   (617) 742-6900

VOL. 1 - 2
LILLIAN CLARK

<u>APPEARANCES</u>:

JERRY COVIELLO, PRO SE
71 North Road
Chelmsford, MA 01824
(978) 256-1986
        Represents Jerry Coviello

JEREMY I. SILVERFINE, ESQ.
Brody, Hardoon, Perkins & Kesten
One Exeter Plaza
Boston, MA 02116
(617) 880-7100
        Represents Town of Chelmsford
                    Chelmsford Police Department

VOL. 1 - 3
LILLIAN CLARK

I N D E X

WITNESS                 DIRECT        CROSS

LILLIAN CLARK

    By Mr. Silverfine        4

    By Mr. Coviello                    21

E X H I B I T S

EXHIBIT NO.           DESCRIPTION        PAGE NO.

NO EXHIBITS WERE MARKED

VOL. 1 - 4
LILLIAN CLARK

1              PROCEEDINGS

2         (Whereupon the Witness was sworn.)

3    DIRECT EXAMINATION

4    Q.  (By Mr. Silverfine)  Good afternoon, Miss Clark.

5         My name is Jerry Silverfine; I represent the

6         Chelmsford Police Department and several police

7         officers in a case titled Jerry Coviello versus

8         Town of Chelmsford, et al., that's been filed in

9         the United States District Court.

10            We're here to take your deposition today

11        and I'll lay out some of the ground rules and

12        we'll explain to you what's going to happen.

13            There is a stenographer to your left that

14        takes down questions and answers, as well as any

15        questions Mr. Coviello has once I'm finished.

16        You're obliged to answer them.

17            If there is anything you don't understand,

18        let us know.

19            If you need to take a break, use the

20        ladies' room, water, let us know.  I'll try to

21        be as efficient as possible.  You can't shake

22        your head or say "huh-huh," you have to give an

23        affirmative response to a question I ask.  Do

24        you understand?

VOL. 1 - 5
LILLIAN CLARK

1    A.   Yes.

2    Q.   Once we finish, a transcript will be made and

3         you'll have an opportunity to review the

4         transcript and fill out what's called an errata

5         sheet if there are any changes or anything you

6         feel is appropriate, you can sign it and fill it

7         out and return it.  If you don't do it within 30

8         days of receipt it will be waived and the

9         transcript goes in as is.  Do you understand

10        that?

11   A.   Yes, I do.

12   Q.   Could you tell us your full name?

13   A.   Lillian M. Clark.

14   Q.   Miss Clark, where do you live?

15   A.   I live at 124 West Main Street in Merrimac,

16        Mass.

17   Q.   How long have you lived there?

18   A.   Ten, almost eleven years.

19   Q.   Who do you live with?

20   A.   My husband.

21   Q.   What's his name?

22   A.   Richard Clark.

23   Q.   Are you employed?

24   A.   Self-employed.

VOL. 1 - 6
LILLIAN CLARK

1   Q.   What do you do?

2   A.   Real estate broker.

3   Q.   How long have you been a real estate broker?

4   A.   God, I've got to stop and think; about 17 years.

5   Q.   Okay.  What's the name of the company?

6   A.   Licensed out of ERA Morrison.

7   Q.   Sorry?

8   A.   ERA Morrison.

9   Q.   What is their address?

10  A.   That's in Dracut, 1688 Bridge Street.

11  Q.   You sell residential?

12  A.   Residential.

13  Q.   What does your husband do?

14  A.   He's retired.

15  Q.   What did he do?

16  A.   He was a computer programmer manager.

17  Q.   For what?

18  A.   For Malden Mills in Lawrence.

19  Q.   How long did he do that?

20  A.   Forty-three years.

21  Q.   Prior to being self-employed as a real estate

22       broker did you work at all?

23  A.   Yes, I worked at Wang.

24  Q.   What did you do for Wang?

VOL. 1 - 7
LILLIAN CLARK

1   A.   I was a supervisor, photo composition

2        department.

3   Q.   How long did you work there?

4   A.   I was at Wang for seven years.

5   Q.   You left there because?

6   A.   I left there -- because the company was closing

7        down -- with the other 5,000 people.

8   Q.   What did you do prior to Wang?

9   A.   Prior to Wang I worked at Frank Thompson, which

10       was also closed.

11  Q.   What is that?

12  A.   A graphic company.

13  Q.   How long did you work for them?

14  A.   Three years.

15  Q.   Prior to that?

16  A.   Prior to that was Shaw Print.  I'm really

17       digging here.

18  Q.   What did you do for Shaw Print?

19  A.   Same thing, photo composition.

20  Q.   How long did you work there?

21  A.   Two years before.

22  Q.   Can you tell us your educational background?

23  A.   High school, three years of college.

24  Q.   Where did you go to high school?

VOL. 1 - 8
LILLIAN CLARK

1  A.  Dracut High.

2  Q.  Where did you go to college?

3  A.  All over.  Northeast, Fitchburg.

4  Q.  Did you ever receive a degree?

5  A.  No.

6  Q.  After you did your three years all over you

7     started to work?

8  A.  Yes.  Well, I shouldn't say that; after I got

9     through there I worked at Raytheon and then I

10    went to Vista.

11 Q.  You were in Vista?

12 A.  I was in Vista for three years.

13 Q.  What did you do for Vista?

14 A.  Organized a health service, birth control,

15    things like that; still going on, various

16    things.

17 Q.  Do you have any criminal record?

18 A.  None that I know of they found me for, no.

19 Q.  How do you know Mr. Coviello?

20 A.  Close friends with his mother.

21 Q.  How many years have you known his mother?

22 A.  His mother, about five to six.

23 Q.  Five to six years.  Did you know her personally?

24 A.  I met her through business and then personally.

VOL. 1 - 9
LILLIAN CLARK

1    Q.   You became friends?

2    A.   Very close friends.

3    Q.   Did you get to know Jerry Coviello?

4    A.   I basically knew Jerry coming and going at the

5         house.

6    Q.   The house at Steadman Street?

7    A.   Yes.

8    Q.   You had been there before?

9    A.   Yes.

10   Q.   Were you aware that Jerry owned a number of

11        guns?

12   A.   No.

13   Q.   Had you ever been to the basement?

14   A.   No.

15   Q.   Were you aware there was a shooting gallery, for

16        lack of a better word, in the basement?

17   A.   No.

18   Q.   Do you have any training or experience in the

19        area of automobiles?

20   A.   I used to work on my own car, if that counts.

21   Q.   What kind of work did you do on your own car?

22   A.   I did a valve job, I used to do ignitions, tooth

23        brushes, things like that.

24   Q.   Oil changes?

VOL. 1 - 10
LILLIAN CLARK

1   A.   Yeah.   When I was poor I had to do my own work.

2   Q.   Besides working on your own car, do you have any

3        background in automobiles?

4   A.   No.

5   Q.   Ever work in any station?

6   A.   No; trained by my father.

7   Q.   Besides the work on your own car, any other

8        background, training, courses you took,

9        certificates you might have received in terms of

10       automobiles?

11  A.   No.

12  Q.   Were you familiar with the car Mr. Coviello was

13       driving on or about August 31st, 2001?

14  A.   Yes.

15  Q.   What kind of car was he driving?

16  A.   Mustang.

17  Q.   Do you remember the make, model?

18  A.   Well, it's a Ford Mustang, obviously.   No, just

19       that it was an older model.

20  Q.   Prior to September 9th, 2001, did you examine

21       that vehicle prior to September 9th, 2001?

22  A.   No.

23  Q.   Did you know what condition it was as of

24       August 31st, 2001?

VOL. 1 - 11
LILLIAN CLARK

1   A.   No.

2   Q.   Had you ever examined the vehicle prior to

3        September 9th, 2001?

4   A.   September 9th is when I wrote the letter.  And I

5        don't have dates; I don't remember dates.  It

6        was the day after this situation took place,

7        that's all I can tell you.

8   Q.   So if this incident took place on the night of

9        August 31st, the Friday into September 1st --

10  A.   Then following then; September 1st.

11  Q.   If I represent September 1st as a Saturday, when

12       would you have --

13  A.   Okay.  Then -- It's been so long now.  It was

14       immediately following this incident that took

15       place but whether it was, like, Saturday or

16       Sunday, I can't tell you; I don't recall.

17  Q.   You don't have a memory as to when you went to

18       look at the car?

19  A.   Yes.  It was after we heard about this incident;

20       I'm not sure if it was Saturday or Sunday.

21       After we heard about this incident we were

22       concerned about Penny due to the fact that she

23       was ill with cancer and I was involved with her

24       care.  And my husband and I had gone over to

VOL. 1 - 12
LILLIAN CLARK

1       check on Penny after we heard about the

2       commotion that took place, and it was at that

3       time that I was involved as far as looking at

4       the car.

5  Q.  At whose request did you look at the car?

6  A.  Penny's.

7  Q.  Why did Penny ask you to go look at the car?

8  A.  We were discussing what took place and she was

9       under the impression the reason he got stopped

10      was one of the back taillights didn't work, and

11      asked us to look at the car.

12  Q.  Did you ask her --

13  A.  She asked us to check it.

14  Q.  Do you know why she asked you?

15  A.  Probably because my husband was there and prior

16      to that there was nobody else that could have

17      done it.

18  Q.  Saturday or Sunday you went to the house and had

19      a conversation with Mrs. Coviello?

20  A.  Correct.

21  Q.  Can you tell us what your conversation was, best

22      memory.

23  A.  First it was checking on her.  She had been

24      going through chemotherapy and we were concerned

VOL. 1 - 13
LILLIAN CLARK

1    about her health and stress of this.  In

2    discussing it she had brought up in regards to

3    the car and I think I asked how come he got

4    stopped and she said, They're saying his

5    taillight didn't work or taillight was broken; I

6    don't know exact words.  I didn't know whether

7    she meant the glass was broken or the light

8    didn't work and then she had asked my husband

9    and I if we would go out and check the car.

10  Q.  That's what you did?

11  A.  Yeah.

12  Q.  Where was the car parked?

13  A.  It was parked where it's always was when I go

14    there, parked over to the side off the main

15    driveway.

16  Q.  The driveway on the side of the house?

17  A.  On the side of the house.

18  Q.  And the car was parked there?

19  A.  Yes.

20  Q.  Were the keys in the house or in the car?

21  A.  I don't remember whether she gave them to us.  I

22    know we had the keys.  I don't recall if she

23    give them to us.

24  Q.  What happened?

VOL. 1 - 14
LILLIAN CLARK

1   A.  My husband sat in the driver's seat and turned

2      it on to accessory so all the lights were

3      working, stepped on the brake lights, put the

4      directionals on and basically checked out the

5      car as far as the light system goes. And like I

6      had stated in my letter, we noticed being an old

7      car we were surprised, really, other than

8      needing a paint job it was in good shape for an

9      old Mustang.

10  Q.  Did you and your husband start the car up?

11  A.  No; just put it to accessory.

12  Q.  Did Mrs. Coviello say there was any problem that

13     she was aware of with the car; any problem?

14  A.  No, I'm sorry. I'm just trying to recall.

15  Q.  Any problem with the car starting, or staying,

16     the ignition, anything you recall?

17  A.  She didn't state there was something wrong and

18     we didn't turn the car on; we had no need to

19     turn the car on.

20  Q.  Before you went out there did she say there was

21     anything as far as a problem with the car?

22  A.  No.

23  Q.  She said -- There was some discussion maybe they

24     stopped him because of a taillight?

VOL. 1 - 15
LILLIAN CLARK

1   A.   Yes.

2   Q.   She didn't say to you the car may not start up

3        or anything like that?

4   A.   No.

5   Q.   So you went out just to look at the lights, as

6        you recall?

7   A.   Correct.

8   Q.   Your husband, you said, put the key on to get

9        the lights on and you were outside the car?

10  A.   I was outside the car.

11  Q.   You looked at the headlight and --

12  A.   Went to both the front and back of the car.

13  Q.   You looked at the brake lights, as well?

14  A.   We tried all the lights.

15  Q.   Anything else you did that you recall?

16  A.   Just going around the car.  We made a note

17       ourselves in discussing that, how

18       well-conditioned the car was for its age.

19  Q.   Did you drive the car at all?

20  A.   No.

21  Q.   When you put your -- you put the lights on, the

22       car was parked and the engine not on?

23  A.   There was no need to put the engine on.

24  Q.   I'm just asking.  You didn't put the brakes on

VOL. 1 - 16
LILLIAN CLARK

1       with the engine on as well; correct?

2   A.  No.

3   Q.  How long did you leave the lights on for, if you

4       know?

5   A.  Well, the headlights were on the entire time we

6       were there doing this.  There was, just like I

7       say, enough to check them out, directionals,

8       stepping on the brake, that type of thing.

9   Q.  You did put on the directionals?

10  A.  Correct.

11  Q.  Fair to say you're not an expert in automotive?

12  A.  No.  No.

13  Q.  Did you, yourself, have any discussion with

14      Mr. Coviello since that time you went over to

15      talk to his mother about this episode?

16  A.  Car or the incident?  The incident, no.

17  Q.  He didn't say anything to you about the

18      incident?

19  A.  (Witness nods.)

20  Q.  You have to answer for the record.

21  A.  He was away for I don't know how many weeks or

22      months.  By the time I got to see Jerry it

23      wasn't the topic of conversation, it was more

24      concerned about the health of his mother that we

VOL. 1 - 17
LILLIAN CLARK

1      discussed.

2  Q.  Did you talk about the car at all after that

3      incident with him?

4  A.  Only in reference to this letter; they asked me

5      if I would write a letter to his attorney.

6  Q.  You wrote this shortly after you --

7  A.  Shortly after the incident.

8  Q.  You sent it to the attorney or handed to him?

9  A.  I gave this to -- his mother and I were at

10      Carlson.

11  Q.  Where?

12  A.  Carlson Real Estate, that's where his mother

13      worked.  That's when I hand-delivered the letter

14      to Penny.

15  Q.  Have you testified in any hearing on this case?

16  A.  No.

17  Q.  Has any investigator come to talk to you about

18      this case?

19  A.  No.

20  Q.  Anybody called you?

21  A.  The Attorney Kerner called me in regards to a

22      court date and he was supposed to call me and

23      due to the time he finally called me I didn't

24      appear or he wanted me to appear I was away.

VOL. 1 - 18
LILLIAN CLARK

1   Q.  Did he say what he wanted you to testify to?

2   A.  It was in reference to the letter.

3   Q.  Did he say what you should say?

4   A.  No; we didn't go over it.

5   Q.  Anybody else that you talked to about this case?

6   A.  No.

7   Q.  Besides your husband?

8   A.  Obviously, he was there.

9   Q.  Anyone give you -- any other written statements?

10  A.  No.

11  Q.  You haven't testified anywhere else besides

12      today?

13  A.  No.

14  Q.  Okay.  When you talked to Mrs. Coviello, at the

15      time did she describe to you what happened on

16      that night?

17  A.  I must say vaguely.  To tell you what took place

18      the entire incident, I don't -- she --

19  Q.  You weren't there, right?

20  A.  Right.

21  Q.  I'm asking what you recall her telling you.

22  A.  That's what I'm saying.  She said that in

23      regards to the police said that he had a gun,

24      that he had and she said that he didn't.  And

VOL. 1 - 19
LILLIAN CLARK

1          that the police had taken all the guns, even toy

2          guns and laid them on a bed and took pictures

3          which he was upset about.

4    Q.   She said he didn't have a gun at all?

5    A.   Not a gun in the house.  The police were saying

6          he was going back and forth and carrying a gun

7          and she said he didn't have a gun.

8    Q.   That's what she told you?

9    A.   Yeah.

10   Q.   Have you learned differently since then?

11   A.   I can honestly tell you I don't know anything

12         about the case except what was in the newspaper.

13   Q.   That brings up a good point.  When did you hear

14         about this incident?

15   A.   It would have been the next day in the Lowell

16         Sun.

17   Q.   Was that September 1st?

18   A.   I don't recall.  Two things: My mother was also

19         in Blair House in Tewksbury and she gets the

20         Lowell Sun.  Up in Merrimac, I don't.  I had

21         another close friend of Penny and I that were

22         involved in her chemotherapy treatments and so

23         forth.  I got a call from Sue, which is the

24         friend of ours, the three of us.  I got a call

1    from Sue and I read it in the paper.  How those

2    incidents took place, I don't recall.

3   Q.   Was it Saturday or Sunday that you read it?

4   A.   I don't recall.

5   Q.   It was after the news article you then called

6        Penny?

7   A.   Yes.

8   Q.   It was after reading the news article --

9   A.   I don't remember if it was after Sue called me

10       or after reading.  Both took place in --

11  Q.   A very short time of --

12  A.   -- each other, yes.

13  Q.   Did you notice any -- I know you said you

14       examined the car, did you look at the car for

15       dents, damage, or scratches, or looking for

16       lights?

17  A.   We weren't necessarily looking for dents; what

18       we noticed was the body of the car was in

19       tremendous shape, great shape for its age.  That

20       I can tell you.  There were no dents on the car.

21       I think we weren't looking for them but then

22       later on recounts of the story from papers that

23       was the one thing that threw me, they were

24       saying in one of the newspapers it was saying

VOL. 1 - 21
LILLIAN CLARK

1      that he had hit a police car.  He couldn't have

2      because there would have been damage on the car

3      and there was no damage on the car.

4  Q.  You said you had not looked at the car prior to

5      that date Penny insisted you look at it?

6  A.  I saw the car all the time.  I was at Penny's

7      all the time.

8  Q.  You didn't examine it?

9  A.  No.

10 Q.  You didn't know what the car looked like before

11     in comparison to that day?

12 A.  No.  No need to look at it.

13          MR. SILVERFINE:  Okay.  I have nothing

14     further.  Mr. Coviello?

15 CROSS-EXAMINATION

16 Q.  (By Mr. Coviello)  You had no reason to cross --

17     to examine my car prior to the date of the

18     incident; is that correct?

19 A.  That's correct.

20 Q.  After you did examine my car; is that correct?

21 A.  Yes.

22 Q.  No matter what it looked like beforehand, after

23     the incident you looked at it and it wasn't

24     smashed up, was it?

```
                                      VOL. 1 - 22
                               LILLIAN CLARK
```

1    A.    No.

2    Q.    There were no dents or bashes?

3    A.    No.

4    Q.    You're not certified as an auto mechanic; is

5          that correct?

6    A.    No.

7    Q.    You have worked on cars and you do know how to

8          do work on cars, general work on cars?

9    A.    Yes, I do.

10   Q.    You're not a licensed electrician, are you?

11   A.    No.

12   Q.    You do know when a light is on and a light is

13         off, don't you?

14   A.    I certainly do.

15                MR. COVIELLO:  Okay.

16                MR. SILVERFINE:  Thank you.

17           (Whereupon the deposition of Lillian Clark

18         concluded at 12:45 p.m.)

19

20

21

22

23

24

VOL. 1 - 24
LILLIAN CLARK


Commonwealth of Massachusetts


I, June N. Poirier, Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on
the 28th day of September, 2005, the deponent
herein, who was duly sworn by me; that the
ensuing examination upon oath of the said
deponent was reported stenographically by
me and transcribed into typewritten form
under my direction and control; and that the
within transcript is a true record of the
questions asked and the answers given at said
deposition, to the best of my knowledge, skill
and ability.

I FURTHER CERTIFY that I am neither
attorney nor counsel for, nor related to or
employed by any of the parties to the action
in which this deposition is taken; and, further,
that I am not a relative or employee of any
attorney or financially interested in the outcome
of the action.

IN WITNESS WHEREOF I have hereunto set

my hand and affixed my seal of office this

20 day of October , 2005.


June N. Poirier, Notary Public
Commonwealth of Massachusetts
My Commission Expires:
June 23, 2011

VOL. 1 - 25
LILLIAN CLARK

ERRATA SHEET

Date of Deposition:  September 28, 2005

Case Name:  Coviello v. Town of Chelmsford

Deponent's Name: Lillian Clark

       I, the undersigned, do hereby certify
that I have read the foregoing deposition
transcript and that to the best of my knowledge,
said deposition transcript is true and accurate
(with the exceptions of the following changes
listed below):

                                    _____
                                    LILLIAN CLARK

                              Dated_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____

Page No.____ Line No.___ Correction_____