# EXHIBIT 20A

CLOSED

# United States District Court
# District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:02-cv-11200-DPW

McLarnon v. Dunphy, et al
Assigned to: Judge Douglas P. Woodlock
Demand: $1,000,000
Cause: 42:1983 Civil Rights Act

Date Filed: 06/14/2002
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Edward S. McLarnon**

represented by **Gregory A. Hession**
99 Forest Park Avenue
Springfield, MA 01108-1631
413-746-3333
Fax: 413-746-6161
Email: hession@crocker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Hon. Sean M. Dunphy**
*Individually and in his official capacity*

**Defendant**

**Supreme Judicial Court of Massachusetts**

**Defendant**

**Middlesex Probate & Family Court**

**Defendant**

**Concord District Court**

**Defendant**

**Sheila E. McGovern**
*Individually and in her official capacity*

**Defendant**

**William Highgas**
*individually and in his official capacity*

**Defendant**

**Beverly Weinger Boorstein**

*individually and in her official capacity*

**Defendant**

**Judith Nelson Dilday**
*individually and in her official capacity*

**Defendant**

**John Buonomo**
*in his official capacity as Middlesex
Register of Probate*

**Defendant**

**Lee G. Johnson**
*individually*

**Defendant**

**Marie A. Gardin**
*individually*

**Defendant**

**Donna L. Lambert**
*individually*

**Defendant**

**Arthur W. Havey**
*individually and in his official capacity*

**Defendant**

**George Briggs**
*individually and in his official capacity*

**Defendant**

**Maxine Doe**
*an unnamed clerk at the Middlesex
Probate and Family Court*

**Defendant**

**Massachusetts General Hospital, The**

**Defendant**

**Barbara Beardslee**

**Defendant**

**Kenneth Herman**

**Defendant**

**Massachusetts Department of Social
Services**

**Defendant**

**David Douglas**
*individually*

**Defendant**

**Lisa Steckler**
*individually*

**Defendant**

**John Doe**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/14/2002 | 1 | Complaint filed. Case assigned to Judge: Woodlock. Receipt #: 39842 Amount:$ 150. Fee Status: paid (mr) (Entered: 06/17/2002) |
| 06/14/2002 | | Summons issued for Sean M. Dunphy, Supreme Judicial Ct., Middlesex Probate &, Concord District, Sheila E. McGovern, William Highgas, Beverly Weinger Boorstein, Judith Nelson Dilday, John Buonomo, Lee G. Johnson, Marie A. Gardin, Donna L. Lambert, Arthur W. Havey, George Briggs, Maxine Doe, Mass General Hosp., Barbara Beardslee, Kenneth Herman, MA Dept. Social Serv, David Douglas, Lisa Steckler, John Doe I-II (mr) (Entered: 06/17/2002) |
| 07/31/2002 | 2 | Notice of voluntary dismissal by Edward S. McLarnon as to Sean M. Dunphy, Supreme Judicial Ct., Middlesex Probate &, Concord District, Sheila E. McGovern, William Highgas, Beverly Weinger Boorstein, Judith Nelson Dilday, John Buonomo, Lee G. Johnson, Marie A. Gardin, Donna L. Lambert, Arthur W. Havey, George Briggs, Maxine Doe, Mass General Hosp., Barbara Beardslee, Kenneth Herman, MA Dept. Social Serv, David Douglas, Lisa Steckler, John Doe I-II , filed. (mr) (Entered: 08/02/2002) |
| 07/31/2002 | | Case closed. (mr) (Entered: 08/02/2002) |
| 08/01/2002 | | Judge Douglas P. Woodlock . Endorsed Order entered granting [2-1] notice of voluntary dismissa. The case shall be administratively closed. Notice sent to counsel. [EOD Date 8/2/02] (mr) (Entered: 08/02/2002) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/27/2007 15:21:52 | | |
| **PACER Login:** bh0207 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1:02-cv-11200-DPW |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

EDWARD S. MCLARNON, )
    Plaintiff )
  vs. )
                     )
SEAN M. DUNPHY, individually, and in his )
    official capacity )
SUPREME JUDICIAL COURT OF )
    MASSACHUSETTS, )
MIDDLESEX PROBATE AND FAMILY )
    COURT, )
CONCORD DISTRICT COURT, )
SHEILA E. McGOVERN, individually )
    and in her official capacity, )
WILLIAM HIGHGAS, individually )
    and in his official capacity, )
BEVERLY WEINGER BOORSTEIN, )
    individually and in her official capacity, )
JUDITH NELSON DILDAY, individually, )
    and in her official capacity )
JOHN BUONOMO, in his official capacity )
    as Middlesex Register of Probate, )
LEE G. JOHNSON, individually, )
MARIE A. GARDIN, individually, )
DONNA LAMBERT, individually, )
ARTHUR W. HAVEY, individually and in )
    his official capacity, )
GEORGE BRIGGS, individually, and in )
    his official capacity, )
MAXINE "DOE", an unnamed clerk at the )
    Middlesex Probate and Family Court, )
MASSACHUSETTS GENERAL HOSPITAL, )
BARBARA BEARDSLEE, )
KENNETH HERMAN, )
MASSACHUSETTS DEPT. OF )
    SOCIAL SERVICES, )
DAVID DOUGLAS, individually, )
LISA STECKLER, individually, )
JOHN "DOE", numbers ONE & TWO, )
    Defendants, )

## 02-11200DPW

RECEIPT # _39849_
AMOUNT $ _150_
SUMMONS ISS. _Y_
LOCAL RULE 4.1 _____
WAIVER OF SERV. _____
MCF ISSUED _____
BY DPTY CLK _____
AO 120 OR 121 _____
BY DPTY CLK _SES_
DATE _6/14/02_

Docket No.

DOCKETED



## **COMPLAINT**

### **Introduction and Jurisdiction**

1.     This is a complaint for relief under 42 U.S.C. §1983, with pendant state claims, against

certain current and past officials, workers, and judges in the Massachusetts court system,

along with other institutions, agencies, social workers and conspirators:

    a.    <u>For declaratory and injunctive relief</u> - Defendants, in conspiracy with David

Douglas[1] and each other, violated Mr. McLarnon's protected due process rights by

a pattern and practice of criminally editing, falsifying, and manipulating official

court hearing tapes, docket records, case files, and impounded files in his Probate

and Family Court restraining order case, and used the Massachusetts anti-SLAPP

law to deprive him of any meaningful remedy.

    b.    <u>For damages</u> - Defendants, in conspiracy with each other, deprived Mr. McLarnon

of due process and equal protection of the law in the Massachusetts State Courts

for seven years, resulting in the "kidnapping" of his son under color of state law.

    c.    <u>For Pendant State Claim</u> - Defendants, by their actions intentionally interfered with

Mr. McLarnon's parent-child relationship, by their fraudulent and deceitful actions

in his restraining order case.

2.     Jurisdiction for this action is pursuant to 28 U.S.C. §1331, as it deals with a civil

complaint arising under the Constitution and laws of the United States, more specifically,

42 U.S.C. §1983, and the 5th and 14th Amendments to the United States Constitution.

3.     Jurisdiction of the pendant state claim is pursuant to 28 U.S.C. §1367, as it is founded on

---

[1]Plaintiff's Ex-Wife's current husband.

Page -2-

essentially the same factual foundation.

4.  The Commonwealth of Massachusetts, by virtue of Articles V and XI of the
    Massachusetts Declaration of Rights, has made itself accountable for suit in Federal Court,
    precluding immunity under the Eleventh Amendment of the United States Constitution.

### Parties

5.  Plaintiff Edward S. McLarnon (Mr. McLarnon) is a natural person domiciled at 49
    Hanover Street, Malden, Massachusetts.

6.  Defendant Sean M. Dunphy ("Judge Dunphy") is the chief justice of the Massachusetts
    Probate and Family Court, located at 24 New Chardon Street, Boston, Massachusetts. He
    is sued in his individual and official capacities.

7.  Defendant Middlesex Probate and Family Court is a unit of the Massachusetts Trial Court,
    located at 208 Cambridge Street, Cambridge, Massachusetts.

8.  Defendant Sheila E. McGovern ("Judge McGovern") is the chief justice of the Middlesex
    Probate and Family Court, located at 208 Cambridge Street, Cambridge, Massachusetts.
    She is sued in her official and individual capacities.

9.  Defendant William Highgas ("Judge Highgas") was, at all pertinent times, a justice of the
    Middlesex Probate and Family Court, located at 208 Cambridge Street, Cambridge,
    Massachusetts. He is sued in his official and individual capacities.

10. Defendant Beverly Weinger Boorstein ("Judge Boorstein") is a justice of the Middlesex
    Probate and Family Court, located at 208 Cambridge Street, Cambridge, Massachusetts.
    She is sued in her official and individual capacities.

11. Defendant Judith Nelson Dilday ("Judge Dilday") is a justice of the Middlesex Probate

and Family Court, located at 208 Cambridge Street, Cambridge, Massachusetts. She is sued in her official and individual capacities.

12.     Defendant John Buonomo ("Register Buonomo") is Register of Probate in Middlesex County, whose office is located at 208 Cambridge Street, Cambridge, Massachusetts. He is sued in his official capacity.

13.     Defendant Lee G. Johnson ("Johnson") is a former Register of Probate in Middlesex County. He is sued in his individual capacity.

14.     Defendant Marie A. Gardin ("Gardin") is a former acting Register of Probate in Middlesex County, and a current assistant Register of Probate, located at 208 Cambridge Street, Cambridge, Massachusetts. She is sued in her individual capacity.

15.     Defendant Donna Lambert ("Lambert") is a former Register of Probate in Middlesex County. She is sued in her individual capacity.

16.     Defendant Arthur W. Havey ("Havey") is an assistant register at the Middlesex Probate and Family Court, located at 208 Cambridge Street, Cambridge, Massachusetts. He is sued in his official and individual capacities.

17.     Defendant George Briggs ("Briggs") is the audio tape coordinator at the Middlesex Probate and Family Court, located at 208 Cambridge Street, Cambridge, Massachusetts. He is sued in his official and individual capacities.

18.     Defendant The Massachusetts General Hospital ("MGH") is a duly incorporated Massachusetts non-profit charitable hospital, whose Children and the Law Program of the Law and Psychiatry Service was ordered by the court to provide Guardian ad litem services to the plaintiff. Its corporate address is 55 Fruit Street, Boston, Massachusetts, and the particular program which is the subject of this action is located at 40 Parkman

Street, Boston, Massachusetts.

19.   Defendant Barbara Beardslee LICSW, ("Beardslee") is a licensed social worker, an agent

or employee of MGH, and was the primary provider of GAL services to the plaintiff.  She

is sued in her official and individual capacities.

20.   Defendant Kenneth Herman Ph.D. ("Herman") is an agent or employee of MGH and is the

director of the Children and the Law Program there, and directed the provision of

guardian ad litem (GAL) services for the Plaintiff.  He is sued in his official and individual

capacities.

21.   Defendant Massachusetts Department of Social Services ("DSS") is an executive agency

of the Massachusetts State government.

22.   Defendant David Douglas LICSW, ("Douglas") is a licensed independent clinical social

worker, and the new husband of Plaintiff's ex-wife.  He has controlled, colluded with, and

manipulated many of the other defendants to bring about the violations complained of

herein.  He is sued in his individual capacity.

23.   Defendant Lisa Steckler ("Steckler") is a duly licensed Massachusetts attorney, and served

as a guardian ad litem for the Middlesex Probate and Family case, as set forth herein.  She

is sued in her individual capacity.

24.   Defendants John Doe ONE and TWO are unidentified agents of one or some of the

defendants who assaulted Mr. McLarnon, requiring hospitalization, and threatened that he

would never see his son again if he went back to court, after a hearing in the matter.


**Background Facts**

25.   The Plaintiff was married in May of 1974 to Virginia Jokisch ("Jokisch"), and divorced in

June of 1986, in the Middlesex Probate and Family Court, Docket No. 148360. Their son Ian McLarnon ("Ian") was born on March 13, 1981.

26.    Between 1986 and 1994, Mr. McLarnon was a custodial parent sharing joint physical custody of his son Ian with his former wife, by virtue of a divorce decree in the Middlesex Probate and Family Court, dated June 11, 1986.

### Concord District Court Facts

27.    On September 1, 1994, Virginia Jokisch obtained an *ex parte* restraining order pursuant to Massachusetts General Laws (M.G.L.) Chapter 209A, at Concord District Court, on behalf of herself and Ian, where Jokisch falsely alleged that Mr. McLarnon abused her, and that he "abused" his son by asking him to write an essay about his bad behavior. The order was returnable on September 9, 1994.

28.    Mr McLarnon had not, as M.G.L. Chapter 209A requires, physically abused the petitioner or placed the petitioner in "fear of imminent serious physical harm."

29.    On September 9, 1994, both parties were present at the return hearing, with Ian. Ian testified to no fear of imminent serious physical harm. The only "fear" he vocalized was, "fear of the disrespect that a relationship should have", implying that he was coached.

30.    Although the plaintiff asked for a one year order, the District Court judge issued an order for a duration of two hours only, and referred the matter to Middlesex Probate and Family Court.

31.    Later, in October of 1995, the court adjudicated a CHINS proceeding for the child Ian, where custody was granted to DSS, without any notice to Mr. McLarnon.

32.    The court will not allow Mr. McLarnon or his counsel to obtain its files on this case. He

asked in 1997, in 1998 with his therapist, and during the week of May 13, 2002, through

counsel, who made a formal request in person.

### Middlesex Probate and Family Court Restraining Order Facts

33.    Later that same day, September 9, 1994, Jokisch made an *ex parte* application to the

Middlesex Probate and Family Court for a new restraining order, on behalf of herself and

Ian, in which she again used the same false allegations of abuse.  No evidence was

presented which conformed to the legal standard required to issue an order under the law.

34.    Nonetheless, Defendant Judge Dilday issued an *ex parte* restraining order, returnable on

September 23, 1994, Middlesex Probate and Family Court Docket No. 84D 3694 AB-1.

35.    At a hearing on September 16, 1994, Mr. McLarnon having moved the return day up,

Jokisch presented a motion for custody of Ian, and for extension of the restraining order,

in front of Defendant Judge Highgas.

36.    At that hearing, Jokisch and Defendant Douglas, Jokisch's husband, each presented a false

affidavit to support their motions.  Douglas, a licenced independent clinical social worker,

(LICSW) made allegations, in a professional capacity, that Mr. McLarnon abused Jokisch

in 1984, years before Douglas even met Jokisch or Mr. McLarnon.  Douglas also made a

clinical diagnosis of Mr. McLarnon as an abuser without any basis, having barely known

him in passing.

37.    At the hearing, Judge Highgas took no testimony, but interrogated Ian in his chambers.

Mr. McLarnon was not allowed to know what was said, nor to respond to the secretly

presented evidence.   There was no on-the-record review of the false affidavits presented,

or rebuttal allowed.  The Judge stated, after his secret interview, that Ian did not want to

see his father, but that he did not cite any instances of abuse.

38.    At the hearing, Judge Highgas read a letter submitted from Mr. McLarnon's therapist, Bruce Jason, assuring the court that he and Doctor Norman Zinberg of Harvard Medical School, Mr. McLarnon's psychiatrist, found no history of abuse by Mr. McLarnon. After being reassured by these mental health professionals, Judge Highgas questioned whether there was a need for a restraining order, and looked straight at Mr. Douglas, who shook his head.

39.    Then Judge Highgas extended the restraining order until November 30, 1994.

40.    Mr. McLarnon later discovered that the tape of this hearing was edited to excise both the reading of Mr. Jason's letter, and the subsequent discussion of having no need for a restraining order. Mr. Jason's letter was not placed in the case file.

41.    At that hearing, Judge Highgas allowed Mr. McLarnon's motion for a psychiatric evaluation of the parties. After the hearing, he then appointed an attorney, defendant Lisa Steckler, a lawyer with no psychological training or credentials, to be the evaluator.

42.    Defendant Steckler did an "investigation" and produced a report, dated October 28, 1994, which falsely accused Mr. McLarnon of abuse. It contained evaluations of Mr. McLarnon from David Adams, EdD, and Lisa Gary, LICSW, both of whom are friends of Defendant Douglas, and who had both worked with Douglas at the same employer.

43.    The evaluations of Adams and Gary condemned Mr. McLarnon, and accused him of abuse, although neither Adams or Gary had ever met with, spoken with, or evaluated Mr. McLarnon. Steckler used these evaluations as a basis for accusing Mr. McLarnon of abuse in her report, at the urging of Douglas.

44.    In November of 2000, Adams and Gary both admitted that David Douglas, not the GAL

Steckler, had contacted them to obtain the reports that were used in Steckler's GAL report. Steckler had not met with either of them, but got the reports from Douglas.

45. In 1996, Mr. McLarnon retained new counsel to deal with the aftermath of the September 16, 1994 Highgas hearing. This attorney made *ex parte* contact with Judge Highgas, who communicated to counsel that he would never win another case in Highgas's court if that attorney took Mr. McLarnon's case to Superior Court. He stated that he had to quit representing McLarnon because Highgas has "his n*** in a vise"

46. At a hearing on November 30, 1994 at the Middlesex Probate and Family Court, Judge Boorstein struck Steckler's report due to: a) Bias, and; b) Steckler was not qualified to make clinical judgments.

47. Judge Boorstein then ordered that the Judge Baker Clinic perform an investigation as Guardian ad Litem for Ian McLarnon.

48. At that hearing, Defendant clerk Havey loudly argued with the judge to not strike the GAL report, lest she have nothing upon which to base the restraining order. This colloquy was edited from the hearing tape.

49. At that hearing, the complainant Jokisch testified for about 15 minutes, repeating the same false allegations that are in her affidavit. Her entire testimony is edited from the hearing tape.

50. At that hearing, Judge Boorstein ordered that Mr. McLarnon have an evidentiary hearing after the guardian ad litem report was produced, and extended the restraining order against Mr. McLarnon until November 30, 1995.

51. After a delay of four months during which no evaluation was performed, the Judge Baker clinic moved as an entirety to another facility, and the order was no longer technically

valid. Clerk Havey further delayed the process by requiring a hearing to merely change the address of the GAL.

52.    At a hearing in March of 1995, Judge Dilday transferred the responsibility for the evaluation to the Law and Psychiatry Service program at Massachusetts General Hospital, ("MGH") via an order issued March 27, 1995.

53.    Judge Dilday also required Mr. McLarnon to pay a fee for that service, in violation of M.G.L. Chapter 215 §56A.

54.    Judge Dilday did not have the power and/or authority or the discretion under 215:56A, to shift the burden of payment from the Commonwealth to the parties.

55.    Defendant Barbara Beardslee, a social worker at MGH, was assigned as GAL.

56.    No report was ever produced, nor did Mr. McLarnon get an evidentiary hearing.

57.    Despite Mr. McLarnon's request at further hearings to complete the report, neither Judge Boorstein or Judge Dilday ordered the report to be produced, so that he could get his evidentiary hearing.

58.    Neither Judge Boorstein or Dilday held MGH, Beardslee or Herman in contempt of court, despite their direct and continued refusal to produce the GAL report ordered by the court.

59.    On November 30, 1995, a restraining order extension hearing took place in front of Judge McGovern. At the hearing, the judge reviewed a letter from GAL Beardslee which stated that Ian was "fragile", and that Douglas and Jokisch were actually abusing Ian. No evidence was presented of abuse by Mr. McLarnon. Nonetheless, Judge McGovern extended the order against Mr. McLarnon, until May of 1996, allowing Ian to stay in an abusive household.

60.    On May 31, 1996, another hearing was held in front of Judge McGovern, where she

interrupted Jokisch's counsel with the statement, "Is this the fellow you told me about the other night?" Jokisch's counsel replied "yes", and Judge McGovern turned to Mr. McLarnon and stated, "You're going to jail, Mister." This threat was edited out of the hearing tape.

61.    The judge also threatened Mr. McLarnon several times with jail if he could not prove his assertion that Defendant Register Lambert was suppressing a key medical report from Domingo Pagan, M.D., which is now missing from the impounded file.

62.    Mr. McLarnon produced paperwork which satisfied the judge, and was not put in jail.

63.    All of these threats from Judge McGovern were edited out of the tape.

64.    At this same hearing, Judge McGovern granted a restraining order against McLarnon to one Jennifer Marino, whom Mr. McLarnon had never met or threatened.

65.    Miss Marino admitted that she was the mother of 14 year old Ian's son, whom she had raped.

66.    Although social worker Douglas and Judge McGovern were mandated reporters under the child abuse laws of Massachusetts, they made no statutorily required report to the Massachusetts Department of Social Services, and did not make a referral to the district attorney for criminal prosecution.

67.    Judge McGovern extended the order until June 26, 1996, without hearing evidence of abuse by Mr. McLarnon, and did not take into account the information previously presented about the abuse from his Mother and David Douglas.

68.    On June 26, 1996, in front of Judge Dilday, Mr. McLarnon requested a postponement, telling the judge that his attorney had just quit his case and refused to give him his file, that his therapist, who was to testify, was seriously ill in the hospital. The judge would not

postpone the hearing.

69.     At that hearing , Judge Dilday coached the plaintiff's attorney to request a removal of an

        exception from the restraining order allowing Ian McLarnon to contact his father, which is

        outside the judge's jurisdictional power.

70.     At that hearing, Defendant Clerk Havey would not give McLarnon his case file after being

        asked, and told that his former lawyer would not relinquish it to Mr. McLarnon.

71.     At the hearing, Judge Dilday completely ignored Mr. McLarnon's repeated protestations,

        and did not even answer or acknowledge that he said anything.

72.     Judge Dilday extended the order until May 30, 1997, without evidence that Mr. McLarnon

        was "placing another in fear of imminent serious physical harm".  Upon query of Mr.

        McLarnon, the judge could not supply any instance of abuse to justify the order, again

        leaving Ian in an abusive home.

73.     On July 1, 1996, Mr. McLarnon was summonsed to Cambridge District Court for an

        alleged violation of the restraining order, which was dismissed when it was shown that the

        version of the order presented by Douglas and Jokisch to the court had been altered, and

        was not valid.

74.     On May 30, 1997, the Court yet again extended the order, until June 18, 1997, again

        leaving Ian in an abusive home.

75.     On June 18, 1997, in front of Judge Highgas, the parties testified briefly.

76.     At that hearing, Judge Highgas "misplaced" Mr. McLarnon's motions to drop the

        restraining order and modify custody, and deliberately misstated the facts in the case

        record, in order to cover up Douglas' and Jokisch's previous perjury.

77.     Judge Highgas renewed the restraining order against Mr. McLarnon until June 18, 1998,

without evidence presented of abuse, again leaving Ian in an abusive home.

78.    Mr. McLarnon asked the judge upon what abuse or threat of harm a restraining order was

based.  The judge could cite no instance, but stated that to Mr. McLarnon, "You've been

overbearing with Ian.  Take my word for it, you've been a little bit overbearing with him."

79.    During the hearing, Judge Highgas mocked and ridiculed Mr. McLarnon in front of his

son Ian, to his shame and embarrassment, and undermined his son's parental respect.

80.    At a hearing on June 30, 1998, Jokisch sought only to renew the order on behalf of Ian,

then 17 years old.  She did not seek to renew her own order.  The only material presented

to the court for that hearing concerned the child.

81.    After a brief hearing where only the parties testified, only one order was issued, pertaining

to the child.  Mr. McLarnon was only served with an order on behalf of the child, and was

never served with an order pertaining to Jokisch, the Mother.

82.    At that hearing, most of the testimony of Virginia Jokisch was edited from the hearing

tape.

83.    At a hearing held June 30, 1999, on whether to extend the restraining order, the attorney

for Jokisch asked to renew Jokisch's non-existent order.

84.    Inexplicably, Jokisch's non-existent order was "renewed", without testimony of abuse.

85.    At a hearing on September 22, 1999, in front of Judge Dilday, Ian, now age 18, requested

a 209A order in his own right.  No evidence of abuse, or fear of imminent, serious,

physical harm was presented.  He had not seen his father in several years.  The most recent

evidence of "abuse" which Ian could evince was that his father had allegedly thrown his

guitar in the grass many years ago.  The order was issued anyway by Judge Dilday.

86.    Mr. McLarnon filed a timely notice of appeal.  However, Defendant Register Gardin did

not docket the order until June of 2000, when any appeal would be moot.

87.     On March 9, 2000, Judge Boorstein heard motions by the plaintiff to correct the record
        and obtain the evidentiary hearing that had been promised to him in November of 1994.
        To this date, Mr. McLarnon had not had an evidentiary hearing, nor is one noted on the
        docket.

88.     One of the many attachments to the Motion to Correct the Record was a meticulously
        documented scientific report with computer wave form analysis of several of the hearing
        tapes in this case, prepared by several forensic audio consultants, showing conclusively
        that the tapes were severely edited.  There were also eyewitness affidavits, which stated
        that material matters which they had heard at the hearings were removed from the tapes.

89.     Without even looking at or ruling on the motions, Judge Boorstein assessed Mr.
        McLarnon $3,500.00 in attorneys fees, pursuant to M.G.L. Ch. 231 §6F.  The motions
        were not docketed for months, so the fee award could not be appealed.

90.     Months later, Judge Boorstein and McGovern allowed two of Mr. McLarnon's motions,
        showing that they were not frivolous, but long after any possibility of appeal of the
        attorney fee sanction.

91.     On June 30, 2000, a hearing was held on renewal of Jokisch's improperly issued 209A
        restraining order before Judge Boorstein, against whom Mr. McLarnon had an open
        complaint at the Judicial Conduct Commission.  Although counsel requested the judge to
        recuse herself, she nevertheless proceeded with the hearing.

92.     After a brief hearing, without swearing in plaintiff Virginia Jokisch, and without any
        testimony or written submission pertaining to the order, Judge Boorstein renewed the
        order for two years.  Mr. McLarnon had witnesses at court who were prepared to testify,

and he desired to cross examine the plaintiff through counsel, neither of which were

allowed.

93.    In July of 2000, Jokisch's attorney filed a Complaint for contempt for payment of the

$3,500.00 in attorneys fees, which was heard on July 24, 2000.

94.    At the time of the filing of the complaint, there were still no findings from the court on

most of Plaintiff's motions, no docketing of the motions, and Defendants Havey and

Maxine Doe had repeatedly denied Mr. McLarnon and his counsel access to his case file.

95.    On July 24, 2000, Judge Dilday found Mr. McLarnon in contempt, and jailed him, without

allowing him to be sworn, give testimony, or present witnesses.

96.    Mr. McLarnon was handcuffed and shackled by order of the judge while his counsel was

literally in the middle of the first paragraph of his defense to the court on the matter,

without any opportunity to present a case, witnesses, or testimony, and was summarily

jailed for non-payment of $3,500.00 in fees to an attorney.

97.    At the time of the contempt hearing, most of the motions for which Mr. McLarnon had

been assessed attorneys fees had not been decided.  Of the two motions of Mr. McLarnon

that had been decided, one was allowed, and one was denied.

98.    On August 2, 2000, five months after the March 9 motion hearing, and over a week after

Mr. McLarnon was jailed,  Judge McGovern denied Mr. McLarnon's Motion to Correct

the Record.  Judge McGovern was not present at the motion hearing.

99.    On September 22, 2000, after a brief hearing in the Middlesex Probate and Family Court,

in front of Sahagian, J., Ian McLarnon's 209A restraining order was vacated, for the first

time since September of 1994.  Ian recanted his previous allegations of abuse, and the

judge found no evidence that Mr. McLarnon had EVER placed his son in fear of imminent

serious physical harm.

100.   The only incident Ian testified to at the hearing allegedly occurred in 1985, when Ian was four years old, when his mother brought him to the doctor falsely stating that his father had bruised him.  However, the medical record from that visit showed "no bruising". .

### Facts Pertaining to Massachusetts Supreme Judicial Court :

### Single Justice Appeal

101.   On June 22, 2000, Mr. McLarnon filed a petition for superintendence to the Massachusetts Supreme Judicial Court, under M.G.L. Chapter 211 §3, alleging essentially the same facts in this complaint, including the falsified court tapes, files, dockets, and improperly issued orders.

102.   After a hearing before Judge Francis X. Spina, on December 13, 2000, the Judge dismissed the petition, stating that the claims should be addressed by the Chief Judge of the Massachusetts Probate and Family Court, Judge Sean Dunphy.  He would not address the substantive claims of falsified records, edited hearing tapes, diverted files, and visible corruption of officials.

103.   Mr. McLarnon had no other legal remedy, since there was no mandated administrative remedy to exhaust prior to seeking SJC intervention for these criminal and judicial violations, and any legal remedy was thwarted by failure to docket orders, and an appeals record that was tainted and unusable because of the editing of the hearing tapes..

104.   Mr. McLarnon did not appeal earlier issued restraining orders, because he was waiting for the promised evidentiary hearing, which he believed would set the matter aright, and dismiss the restraining order.

### Facts Pertaining to the Massachusetts Supreme Judicial Court :

### Anti-SLAPP Dismissal of Civil Rights Suit

105.   Due to false allegations in Jokisch's and Douglas's affidavits which they used to obtain the restraining orders, Mr. McLarnon filed a malicious prosecution and civil rights complaint against Jokisch and Douglas in Middlesex Superior Court in January of 1998.

106.   The defendants filed a special motion to dismiss under the so-called anti-SLAPP law, M.G.L. Chapter 231 §59H, which protects petitioning activities from suit, when the suit is based solely on those petitioning activities.

107.   The Superior Court dismissed Mr. McLarnon's suit against both defendants, even though Mr. Douglas was not a petitioner, and not covered by the law.

108.   Mr. McLarnon appealed the dismissal, which the Massachusetts Supreme Judicial Court took up for review on its own, based on the fact that false claims in petitioning should not be protected under the anti-SLAPP law.

109.   On May 4, 2000, the Supreme Judicial Court upheld the dismissal in favor of both Jokisch and Douglas, even though Mr. Douglas was not a petitioner.

110.   This dismissal established that false claims of abuse in restraining orders are now protected from suits for malicious prosecution and civil rights, in essence establishing a "perjury protection law", and eliminating a remedy for redress, in violation of the 14th Amendment of the Constitution.

111.   The judges of the SJC acted in a nonadjudicatory fashion and, in effect, rewrote the anti-SLAPP statute in such a manner that they suspended it and usurped a legislative function in violation of the constitutionally guaranteed separation of powers, and thereby violated Arts. XX and XXX of the Mass. Declaration of Rights.

### Failure of Chief Justice Dunphy to Correct Wrongdoing and to Train

112.   In early March of 2001, Counsel presented the Tape Report, and voluminous material proving the facts set forth in this complaint, to Defendant Judge Dunphy, Chief Justice of the Massachusetts Probate and Family Court, after the SJC would not intervene.

113.   Judge Dunphy wrote back requesting more information, which counsel provided, but avoided addressing the substantive issues set forth in Mr. McLarnon's submission, namely the falsified master tapes and court record in the Middlesex Probate and Family Court, and the actions of its corrupt officials.

114.   In an attempt to justify destruction of certain of the falsely edited tapes, Judge Dunphy refused to acknowledge the application of Massachusetts Supplemental Probate Court Rule 201, which requires tapes to be saved as long as the matter is pending in any court.

115.   To date, Judge Dunphy has not admitted to, or taken action to correct the pervasive wrongdoing in his Courts, which has obstructed and delayed Mr. McLarnon's due process even further.

116.   Judge Dunphy has failed to train the defendant judges in the proper procedure and administration of the Massachusetts restraining order law, Chapter 209A.

117.   Judge Dunphy has covered up the illegal tampering with the court record, hearing tapes, dockets, case files, and other official records of the Middlesex Probate and Family Court.

118.   Judge Dunphy has failed to require the Middlesex Probate and Family Court to correct the false docket entries in Mr. McLarnon's file.

119.   Judge Dunphy has failed to require the Register to replace the report of Dr. Domingo Pagan, which he or his agents removed from the impounded file.

120.   Judge Dunphy has failed to train personal sufficiently and ensure that case files are

available to the public, and confidential reports are kept in the impounded file, according

to Massachusetts law.

121.    Judge Dunphy has failed to propound appropriate standards and requirements for

guardians ad litem in the Probate Court, so that MGH, Beardslee and Herman were not

constrained to obey any requirement to file their report, as ordered by the court.

122.    Judge Dunphy has failed to instruct the Middlesex Probate and Family Court judges to

obey Massachusetts General Laws Chapter 215 §56A, requiring the Commonwealth to

pay for all court ordered guardian ad litem reports.


## Facts Involving Hearing Tapes

123.    The hearing tapes of at <u>least</u> four of the hearings in the above referenced 209A restraining

order case have been materially edited, and a substantial amount of material has been

removed from them.  The edits are not random; They are carefully crafted to remove

material that was damaging to defendants and helpful to plaintiff.

124.    The tape of the November 30, 1994 hearing in front of Judge Boorstein was edited in

several critical places.  For example:

    A.    The entire discussion where Defendant Havey engaged in a lengthy and heated

discussion with the judge, in which he expressed his opinion that the judge should

not vacate a GAL report submitted to the court, was removed.

    B.    The perjured testimony of Virginia Jokisch, amounting to about 12-15 minutes,

was entirely removed.

125.    The tape of the June 30, 1998 hearing in front of Judge Dorothy M. Gibson was edited to

remove about four minutes of the perjured testimony of Virginia Jokisch.

Page -19-

126.  The tape of the September 16, 1994 hearing in front of Judge Highgas was edited to
      remove the judge's entire discussion of a letter submitted from Mr. McLarnon's therapist
      Bruce Jason, assuring the court that he and Doctor Norman Zinberg of Harvard Medical
      School found no history of abuse by Mr. McLarnon, and asking rhetorically whether there
      was a need for a restraining order. This same letter has also been removed from the case
      file.

127.  The tape of the May 31, 1996 hearing in front of Judge McGovern was edited to remove
      the record of the judge asking opposing counsel whether Mr. McLarnon was the person
      they had discussed "the other night", several threats to jail Mr. McLarnon, as well as all
      references to the medical report of Domingo Pagan, M.D..

128.  Mr. McLarnon, who is a forensic audio specialist by trade, prepared the thesis for a
      lengthy report (the "Tape Report"), consisting of computer wave form analysis showing
      at least 10 improper edits in two of the hearing tapes, as well as edits in many others. The
      report also contains corroboration by two other independent and experienced audio
      consultants verifying the edits, as well as reconstructed transcripts and affidavits of
      witnesses who were at the hearings, verifying the material that was missing from the
      edited tapes.

129.  At a hearing on December 15, 1999, after reviewing the Tape Report, the Court issued an
      order requiring the Register of Probate at the time, Defendant Lee G. Johnson, to
      impound nine hearing tapes for this case, in anticipation of a motion from Mr. McLarnon
      to investigate.

130.  On that day, Register Johnson requested a copy of the tape report, which counsel gave
      him. Despite letters and calls from counsel, Mr. Johnson did not respond or address the

allegations in the Tape Report.

131.    On November 7th and 8th, 2000, Edward Oliver, a reporter for the *Massachusetts News*, was able to observe the tape duplication office at the Middlesex Probate and Family Court, and speak to Defendant George Briggs, the employee who supervises that office. Mr. Oliver discovered an unusual recording setup that would allow Mr. Briggs to edit the hearing tapes as alleged, and that would not be used or needed for tape duplication in a court.

132.    On information and belief, Defendant Briggs, at the direction of defendants Havey, Douglas, and the Defendant judges, edited the tapes of Mr. McLarnon's hearings.

133.    After Mr. McLarnon discovered the tapes were edited and complained about it, one or more of the Defendants destroyed several of the master hearing tapes.

134.    In her ruling on Mr. McLarnon's Motion to Correct the Record, Judge McGovern deliberately misquoted the Massachusetts rule requiring the preservation of tapes, Supplemental Probate Court Rule 201, which requires tapes to be saved as long as the matter is pending in any court, and justified their destruction.

135.    Judge McGovern also summarily refused to address the issue of the tape editing, with a statement that she had confidence in the tapes, and did not respond to the specific scientific proof of their editing, thereby covering for the wrongdoing of her fellow defendants.

136.    To date, none of the defendants have addressed or disproved a single allegation in the Tape Report. No one has provided proof to refute any of the edits or changes alleged by Mr. McLarnon, or his allegations that the defendants were responsible for them.

137.    Mr. McLarnon purchased copies of all the edited hearing tapes from the Court, and had

them transcribed, all at substantial personal expense, only to find that they were falsified, and thus useless for purposes of appeal, impeachment, or support of his motions.

138.    Any appeal using the falsified written record and edited audio tapes would be unfair and invalid, since the Appeals Court would not have a true record of the proceedings below.

139.    In March or April of 2001, McLarnon requested that Defendant Briggs provide him with an audio tape of the September 22, 2000 hearing in Ian's restraining order case, which was docketed under a different case number than all the other restraining orders.

140.    Mr. Briggs stated that the tapes were impounded by Judge McGovern. However, only the tapes in the divorce case were impounded.

141.    Mr. Briggs consulted with Judge McGovern, and stated that she would not allow him to give the tape to Mr. McLarnon.


### Facts Concerning Mr. McLarnon's Case File

142.    The Middlesex Register's office has extensively manipulated the case file (including an impounded part of the file) in Mr. McLarnon's Case.

143.    Mr. McLarnon has rarely been allowed to see his case file, or its impounded portion, since 1994, when the first restraining order was issued. Mr. McLarnon has attempted to see the Impounded File dozens of times during this case. He is usually told that it cannot be found. Counsel was finally able to see it briefly in December of 1999, but, despite repeated requests, has not seen it since then.

144.    The contents of the case file have been repeatedly tampered with by all the defendant Registers of Probate, and Defendants Havey and Maxine Doe. Motions have disappeared, secret affidavits have appeared, the docket has been altered, and the file contents have

varied.

145.    Documents from Mr. McLarnon's active case file, Docket No. 84D 3694, had the docket

numbers crossed out, and were improperly diverted to an earlier closed 1984 divorce file,

stamped 'inactive', Docket No. 148360, by defendants Maxine Doe and/or Havey.

146.    A letter presented to Judge Highgas from therapist Bruce Jason, dated September 14,

1994, and made part of the evidence of a hearing on September 16th of that year, has

simply disappeared from the file, along with the entire discussion of it on the audio tape.

147.    On June 26, 1996, at a hearing at which Mr. McLarnon appeared pro se, he attempted to

obtain his case file to take into court.  Defendant Havey handed Mr. McLarnon his file,

which contained only the Steckler GAL report and the current restraining order, and was

missing the rest of the more than 70 documents shown on the docket.

148.    Present counsel first attempted to review the case file on September 22, 1999, but it

wasn't there.  After many calls to the Register's office, they found the file on October 8,

1999.

149.    On December 15, 1999 and January 10, 2000, counsel again attempted to see the file.  It

was not there either time.

150.    At the September 22, 1999 hearing, a letter from the Mass. Dept. of Social Services

condemning Mr. McLarnon had been secretly placed in the file.  It was not placed in

evidence, nor shown to counsel or the defendant.  Counsel observed the Judge reading

something during the hearing, without knowing it was the letter, until later inspection of

the file.

151.    At the March 9, 2000 motion hearing, the case file was not there, and counsel and Mr.

McLarnon were precluded from reviewing it.  The entire file, including the new copies