# EXHIBIT 20B

provided, disappeared again after the motion hearing for over six months.

152.  At that same March 9, 2000 hearing, GAL Beardslee from MGH was allowed to present a secret affidavit, which counsel could only briefly look at, and was not allowed to have. A request to Judge Boorstein for a copy of the affidavit was denied.

153.  On November 7, 2000, Mr. McLarnon again attempted to obtain his case file. Defendant Maxine "Doe" told him it was not there, and he would have to come back another day. Mr. McLarnon continued to request the file during a four hour period from about 10:00 AM to 2:00 PM.

154.  About 2:00 PM, almost immediately after Mr. McLarnon's last request, Edward Oliver, a *Massachusetts News* reporter, went to the counter and asked Defendant Maxine "Doe" for Mr. McLarnon's public case file. Defendant Havey then got it for him to see, even though it was "not there".

155.  On November 8, 2000, at approximately 11:00 A.M., Mr. McLarnon, asked defendant Maxine Doe to see his impounded file. Again, it could not be found, until about 2:30 P.M., after much wrangling with Defendant "Doe".

156.  Petitioner has appealed several rulings in this case, as far back as September 22, 1999. Not one has been acknowledged, to counsel's knowledge, negating any appeal remedy.

157.  The defendant and his counsel have repeatedly been denied access to Mr. McLarnon's impounded file for years by defendant Havey, by each of the defendant Registers of Probate, and by defendant Maxine Doe.

158.  A 1985 report by Domingo Pagan, M.D. (The "Pagan Report") has been removed from the impounded court file, which condemned Jokisch's allegations of domestic abuse as unfounded, and said that false allegations of abuse should not be brought up again.

159. In April of 1996, Mr. McLarnon's therapist called Defendant Lambert, then Register of
Probate, to review the Pagan Report. Lambert confirmed that the report was in the file,
and read portions of it to the therapist. Mr. McLarnon went immediately to the Court to
see the report, but was told by Lambert, "It was never there", and "it had never been
impounded."

160. On June 26, 1999, Judge Edward Donnelly of the Middlesex Probate and Family Court
ordered the then Register of Probate Marie Gardin, the Middlesex Family Service Clinic,
MGH, and three attorneys to search their files for the report, and to respond to the
Register's office as to whether they were able to find it.

161. Everyone who had the Pagan Report responded that it was gone.

162. In September of 2000, Jokisch's attorney sent counsel and the Register a redacted copy of
the "missing" Pagan Report, "found" by Virginia Jokisch in her files. However, it was
missing a signature and much of the conclusion.

163. Even though the copy sent to the court is not accurate, has come from a party rather than
the doctor, and lacks any signature of the doctor, the Register's office placed it in the
public case file. Any medical report about a minor child must be placed in the impounded
file.

164. Other documents in the impounded file have also been tampered with. The impounded
GAL report by Defendant Steckler, described above, which was struck by Judge
Boorstein at a hearing on November 30, 1994, was placed in the public file rather than the
impounded file where it belongs. There is no notation that the report had been struck.

165. Defendant Douglas took a copy of the discredited Steckler report, and used it to poison
proceedings at the Massachusetts Dept. of Social Services, the medical records at Ian's

pediatrician, and school records.

166. Similarly, a medical report of Dr. Arne Korsvedt, favorable to Mr. McLarnon, was removed from the impounded case file, and never returned.

## Facts About the Manipulation of the Docket

167. Between September 22, 1999 and June of 2000, not one hearing in the McLarnon case was docketed by defendants, even though several took place  The Register's office stated that they were behind in docketing, but a check of other docket sheets showed motions docketed within one or two weeks after hearings..

168. On June 28, 2000, one day after serving a superintendence petition to the Massachusetts Supreme Judicial Court on the Middlesex Probate and Family Court, the court docketed all the motions which they had refused to docket up until then.

169. The docket of the McLarnon case does not contain notations listing most of the documents which are or should be impounded.

170. Recently, the court began to docket more various public and impounded documents which it had long withheld, "lost", or refused to docket.  Many entries are placed in formerly empty spots on the page, and some are squeezed in between the lines of others, including the Steckler GAL report, which was inserted in the year 2000, and backdated to 1994.

171. At a hearing on Plaintiff's Motion to Correct the Record in the Probate and Family Court on July 31, 2000, Judge Boorstein, when confronted with evidence of blatant revisions and fabrications in the docket, admitted that "the docket is no good".

## Mr. McLarnon Threatened

172.  On June 12, 1996, Mr. McLarnon was summonsed to Cambridge District Court for a
criminal complaint for violation of his restraining order before the judge, rather than being
given a statutorily required show cause hearing.  After much wrangling, one was
scheduled.

173.  On July 1, 1996, Mr. McLarnon returned to Cambridge District Court for the show cause
hearing on whether to issue a complaint for violation of the restraining order in this case.
Jokisch presented a doctored copy of the restraining order to the Magistrate, alleging Mr.
McLarnon had violated it.  However, Mr. McLarnon had a copy of the genuine order,
which he had not violated, and was able to refute Jokisch's allegations.  The magistrate,
rather than ask Jokisch about this, turned to Defendant Douglas, a non-complainant, for
an explanation.

174.  Mr. McLarnon requested a copy of the restraining order submitted to the court, and a
copy of the tape of the hearing.  Both requests were refused.

175.  Three days later, while Mr. McLarnon was stopped at an intersection near his house in
Malden, Massachusetts, two large men, John Does One and Two, yanked him out of his
vehicle, beat him severely, and told him that he better not go back to court if he ever
wanted to see his son again.  The beating was severe enough that he had to seek
emergency room treatment.

176.  When counsel later attempted to check the criminal file at the Cambridge District Court,
most of the documents had been removed.

## Facts Pertaining to GAL Evaluation/Massachusetts General Hospital

177.    On March 27, 1995, Judge Dilday ordered that an evaluation of Mr. McLarnon, his former

wife Virginia Jokisch ("Jokisch"), and their son Ian McLarnon, take place at the Law and

Psychiatry Service of MGH.

178.    This evaluation was to fulfill an November 30, 1994 order of Judge Boorstein that there

be an evidentiary hearing on visitation, to be scheduled upon completion of the evaluation.

179.    Defendant Judge Dilday ordered Mr. McLarnon to pay for the difference between the cost

of the original evaluation and the new one, despite M.G.L. Ch. 231 §56A, which requires

the Commonwealth to pay the entire cost for all court ordered GAL evaluations.

180.    Defendant MGH required $3000.00 in advance for the evaluation, and MGH accepted

such payment, despite the law requiring the Commonwealth to pay such costs.

181.    In August or early September of 1995, GAL Beardslee told Mr. McLarnon's therapist that

they were going to reunite Ian with his father, in time for the beginning of the school year.

182.    Two months later, on October 31, 1995, Beardslee unilaterally decided to discontinue the

court ordered evaluation, ostensibly because Jokisch and her new husband David Douglas

were having trouble with Ian.  Beardslee sent a letter to that effect to the Register of

Probate, without seeking permission of the court, notifying Mr. McLarnon, or requesting

any hearing at the court.

183.    In another seven months, on May 24, 1996, Beardslee sent a letter to the court falsely

blaming Mr. McLarnon for wanting to stop the evaluation in October.

184.    At hearings on May 29, and May 31, 1996, Judge McGovern ordered that the evaluation

continue.

185.    Nonetheless, MGH, Beardslee, and Herman did not continue the evaluation, and have not

completed it to this day.

186.  As a consequence, Mr. McLarnon has never had the evidentiary hearing which was

dependent on the completion of the GAL report, and has consequently never been allowed

to re-established custody of his son Ian since 1994.

187.  Dr. Kenneth Herman, Beardslee's supervisor at MGH, threatened Mr. McLarnon that he

would not see his son unless he contracted for up to two years of therapy services with

them, at a huge additional cost. There was no order for therapy.

188.  Mr. McLarnon was forced to defend himself at a number of court hearings during and

after the pendency of the evaluation, which could have been avoided had the court ordered

the GAL to perform its duties, and produce a report.

189.  Mr. McLarnon did not appeal the underlying restraining orders, pending the production of

the GAL report, after which he anticipated the court-mandated evidentiary hearing to

overturn to the order, once the false allegations were exposed..

190.  During the time in which the guardian ad litem was controlling the therapy of Mr.

McLarnon's son Ian, aged 14 through 15, Mr. McLarnon shared joint legal custody with

the mother.  However, the court and the GAL hid the facts from Mr. McLarnon that his

son was criminally prosecuted twice, was the subject of three CHINS petitions, and that

the GAL allowed Ian to live with a 21 year old woman who plied him with drugs and

alcohol, and with whom he had a child at age 14.

191.  Herman and Beardslee knew that the child was living in an abusive and dangerous

situation, not only failing to do anything to stop it, but allowing and encouraging it, thus

becoming complicit in Ian's abuse.

192.  Additionally, Ian was placed in special education, where Defendant Douglas signed as the

father of Ian, without Mr. McLarnon's knowledge or permission, with Beardslee's knowledge.

193. Ian came to Mr. McLarnon in mid May of 1996 and begged for help, stating "I'm caught in a plot and I can't get out". By this, he was referring to the manipulations of his mother, stepfather defendant Douglas, the GAL, juvenile probation personnel who were friends of his stepfather, and their lawyers.

194. After coming to his father for help, Ian was hounded by the "plotters", and defendant Douglas pushed Jokisch to make a false criminal complaint against Mr. McLarnon.

195. MGH has not refunded the money paid by Mr. McLarnon for the report it did not produce, despite being asked to do so, and has invoiced him an additional $2,190.00.

196. Beardslee of MGH presented a secret updated affidavit to the Court on March 9, 2000, but the court would not let counsel or Mr. McLarnon have a copy of it.

197. Beardslee ordered Ruth Kirschbaum, of the special education department of the Town of Lexington, to not notify Mr. McLarnon that Ian was undergoing a CORE evaluation, which requires parental notification. Thus, Mr. McLarnon was removed from another aspect of his son's life.

### Facts About the Massachusetts Department of Social Services

198. The Defendant Massachusetts Department of Social Services ("DSS") took custody of Ian on October 13, 1995, after a CHINS complaint was filed by Jokisch and Douglas.

199. Mr. McLarnon was never notified by the Court or DSS of any of the proceedings. They took custody without informing Mr. McLarnon, who found out for the first time almost a year later.

200.   DSS allowed the child to live in an abusive, exploitative, drug and alcohol saturated relationship with an older woman, with whom he had a child, all without informing the father.

201.   David Douglas had a friend in Cambridge Juvenile Probation manipulate the contents of the files which were used by DSS, in order to show no fault to Douglas.

202.   DSS has to this day refused to produce its records to Mr. McLarnon or to his counsel.

## Facts Concerning Damages

203.   The defendants' actions in issuing illegal restraining orders on perjured testimony, and covering up with falsified records, has damaged Mr. McLarnon by loss of consortium with his son for seven years.

204.   The Defendants' actions in kidnapping his son under color of law has caused Mr. McLarnon substantial emotional and physical distress. He has been harmed and has been suffering from worry about the welfare of his son, grief from the loss of a meaningful relationship with him and watching him be raped and abused, induced into drugs and alcohol and recycled through the system with arrests, abuse clinics, etc. He has felt stress, humiliation, anxiety, fear for his son's safety and well-being, loss of trust, loss of confidence in and feelings of betrayal by the justice system, shock, and emotional scarring, all compensable as emotional distress, and other damages.

205.   Mr. McLarnon was injured physically and emotionally by agents of the defendants, when he was dragged from his car, beaten, and threatened to stop his legal proceedings, or he would not see his son again.

206.   The defendants deprived Mr. McLarnon of his protected 2nd Amendment right to bear

arms, due to the false restraining order, which illegally removed his ability to defend

against the physical attack by the defendants' agents.

207.    The Defendants damaged Mr. McLarnon by hampering his ability to engage in his

profession of music composer/arranger, due to the emotional stress, humiliation, fraud,

stonewalling, collusion, and corruption, and the amount of time spent defending himself

against the false allegations, which has resulted in a drastic loss of earning capacity and

income.

208.    Since the defendants' false allegations of abuse, Mr. McLarnon has been put on a registry

of alleged abusers, which has virtually destroyed his ability to find work in the electronics

or forensics fields in which he has experience.

209.    Mr. McLarnon has been damaged by substantial legal fees to defend himself in several

hearings held during the pendency of the GAL evaluation, which would have been

unneeded had the defendant judges and GAL defendants performed their contractual

duties.

210.    Mr. McLarnon has been damaged in the amount of $3000.00 in illegally extracted GAL

fees, and liability for $2,190.00 more, in violation of Massachusetts law.

211.    Mr. McLarnon has been damaged by the assessment of $3,500.00 in attorneys fees for

bringing motions to the Court to seek to correct the record that the defendants falsified,

prior to rulings on those motions.

212.    Mr. McLarnon has been damaged by being falsely incarcerated in the Middlesex House of

Correction for non-payment of attorneys fees.

213.    Mr. McLarnon has been damaged by repeated deprivation of his due process rights to an

appeal, since there is no accurate record from which to appeal.

214.    Mr. McLarnon has been damaged by forbearing on appeals of several early restraining

orders, and thus losing his right of appeal, due to his reliance on the order and promise of

an evidentiary hearing by judge Boorstein.

215.    The defendants' failure to act in a timely fashion both administratively and judicially, and

continue to ignore the evidence, refer the matter the others, or blame Mr. McLarnon, have

led to inexcusable delays, and violate Mr. McLarnon's right to due process.

216.    The financial pressure caused by the defendants forced Mr. McLarnon to file for

protection under Chapter 7 of the United States Bankruptcy code, incurring further

financial stress.


## COUNT I

### Violation of Civil Rights- Official Capacity Defendants Only

217.    Plaintiff reasserts and incorporates all averments set forth above into this count.

218.    The judges and Register officials in the Middlesex Probate and Family Court have engaged

in a pattern and practice of violating Mr. McLarnon's due process rights as protected

under the 5th and 14th Amendments to the United States Constitution, as follows:

A.    The right to appeal adverse decisions in his restraining order hearings, due to

falsified hearing tapes, concealment of the case record, manipulation of the case

file, falsification of the case docket, refusal to docket hearings, and the removal of

key documents from the record;

B.    The right to a fair, unbiased tribunal;

C.    The right to timely justice, rather than continual delays.

D.    The right to an accurate, truthful, complete written and audio record of the case;

E.  The right of access to the public case record and impounded record of this case;

F.  The right to tapes of hearings, rather than their destruction by the court in a case that is open.

G.  The right to an evidentiary hearing in this matter, with an accurate, truthful record;

H.  The right to be heard before being incarcerated;

I.  The right to be free from unjust incarceration over non-payment of attorney's fees to an opponent's lawyer;

J.  The right to enjoy the companionship and direct the upbringing of his son.

219.  All the actions of the defendants set forth above were done under color of law.

220.  No effective remedy at law is available.  The court from which Mr. McLarnon has sought a remedy is corrupt and is thwarting every attempt to obtain a remedy, withholding the case file, falsifying the record, making any appeal impossible by failing to docket hearings, denying the falsified record after being shown irrefutable scientific proof, making appeal impossible because any record on appeal would be materially tainted, refusing to allow an evidentiary hearing where these issues could be addressed, and incarcerating Mr. McLarnon without an opportunity to be heard.

221.  The plaintiff has been damaged in numerous ways by the defendants' actions and failure to act,  as set forth in the "Damages" section above.


WHEREFORE, the Plaintiff requests the following equitable relief:

A.  Appoint a special master to investigate the falsification, destruction and concealment of hearing tapes in this Middlesex Probate and Family Court case, to determine who did the editing, which tapes were edited, when and how it was accomplished, who improperly

destroyed hearing tapes, and who ordered it to be done;

B.    Issue a temporary and permanent injunction, enjoining the Middlesex Register of Probate,

all Middlesex Probate and Family Court judges, and their agents, from editing, falsifying,

destroying, and concealing tapes of hearings in this case;

C.    Issue an order to the Chief Judge and Register of the Middlesex Probate and Family

Court, requiring them to provide Mr. McLarnon with any available unedited copies of

tapes of all hearings in this case, as well as transcripts of such tapes, at the expense of the

Commonwealth;

D.    Issue an injunction to the Middlesex Register of Probate, enjoining him from failing to

Docket all motions, orders, documents, and hearings in this matter in a timely manner;

E.    Issue an injunction to the Middlesex Register of Probate, enjoining him or his agents from

withholding the case file, including the impounded file, in this case, from inspection by Mr.

McLarnon and his counsel at any time upon reasonable request and notice;

F.    Issue an injunction to the Middlesex Register of Probate, enjoining him or his agents from

withholding or removing any documents that should be properly contained in Mr.

McLarnon's case file, past or future;

G.    Issue an order to require a full accounting by the GAL appointed in this matter, as to why

it has never produced a report ordered by the judge in November of 1994;

H.    Issue an order to Judge Dunphy, Chief Justice of the Massachusetts Probate and Family

Court, to fully investigate the wrongdoing in the Middlesex Probate and Family Court;

I.    Issue an order to Chief Judge McGovern requiring her to hold a full evidentiary hearing in

this restraining order matter, after all the fraud and false documentation by the court is

corrected.

J.      Issue an order requiring Judge McGovern and Judge Dunphy to make referrals to the
Middlesex District Attorney for any criminal violations of laws against tampering with
public records which the investigation uncovers.

K.      Issue an order for attorneys fees and costs against the defendants necessary to prosecute
this action.

L.      Issue an order to remove Mr. McLarnon's name from the abuser registry;

M.      Any other relief that is just, in order to redress the harm that these actions have done to
Mr. McLarnon and his son Ian.

## COUNT II

### Civil Rights Violations - Individual Capacity Defendants Only

222.    Plaintiff reasserts and incorporates all averments set forth above into this count.

223.    The defendants, in their individual capacity, engaged in a pattern and practice of depriving
Mr. McLarnon of his protected due process rights under the 5th and 14th Amendments to
the United States Constitution, as set forth above.

224.    John Does One and Two beat and threatened Mr. McLarnon to not exercise his due
process rights in court.

225.    All of the actions by the defendants set forth above were done under color of law.

226.    Defendant Douglas, acting in collusion with an uncertain number of the state defendants,
helped these state defendants to violate Mr. McLarnon's due process rights.

227.    The plaintiff was damaged by the defendants' actions, as set forth above.

WHEREFORE, the plaintiff requests the following relief:

A.    A judgment in the plaintiff's favor that the all of the defendants, individually and in concert, violated Mr. McLarnon's protected 5th and 14th Amendment due process rights;

B.    An award of money damages against all the defendants for violation of his civil rights;

C.    An award of money damages against all the defendants for loss of consortium with his son;

D.    An award of money damages against all of the defendants for emotional distress;

E.    An award of money damages against John Does One and Two, for medical expenses and pain and suffering from the beating at their hands;

F.    An award for previously expended attorneys fees for defense against the defendants' improper actions in the Middlesex Probate and Family Court;

G.    An award of attorneys fees and costs for prosecuting this action;

H.    Any other relief which seems just;

## COUNT III

### Declaratory Judgment - Massachusetts Anti-SLAPP Law

228.    Plaintiff reasserts and incorporates all averments set forth above into this count.

229.    The Massachusetts anti-SLAPP law, Massachusetts General Laws, Chapter 231 §59H, as applied, deprives persons of a remedy at law, in violation of the due process requirement in the Fourteenth Amendment to the United States Constitution, and Article XI of the Massachusetts Declaration of Rights.

230.    The judges of the SJC acted in a nonadjudicatory fashion and, in effect, rewrote the anti-SLAPP statute in such a manner that they suspended it and usurped a legislative function

in violation of the constitutionally guaranteed separation of powers, and thereby violated

Arts. XX and XXX of the Mass. Declaration of Rights.

WHEREFORE, plaintiff requests that the court declare that Massachusetts General Law, Chapter

231 §59H is unconstitutional, as applied.

## COUNT IV

### Intentional Interference With Parental Rights - State Claim

231.   The individual and corporate defendants, as well as the DSS, individually, and in

conspiracy with each other, intentionally interfered with Mr. McLarnon's parent- child

relationship with his son Ian, resulting in a loss of filial consortium.

232.   The defendants, in essence, abducted, enticed, harbored and secreted Ian from a Father

who had legal custody.

233.   Through an active and wrongful effort, knowing that Mr. McLarnon did not consent, the

defendants induced Ian to leave his Father's home.

234.   The defendants further encouraged the child, once away from Mr. McLarnon's home

without consent, harbored him and continued to keep him away from the parent.

235.   While away, the defendants placed Ian in a damaging relationship which further interfered

with his relationship with his father.

236.   While away, the defendants enticed Ian to quit school, depriving him of an education.

237.   Ian has been, and continues to be substantially damaged by the disruption of this

relationship.

238.   The Father has been substantially damaged, as set forth above, by the intentional

interference with his relationship with his son.

WHEREFORE, Mr. McLarnon requests the following relief:

A.    Damages for the loss of more than seven years with his son.

B.    Damages for the emotional harm done to Mr. McLarnon, as he daily grieves his loss.

C.    Damages for cost of recovering the child;

D.    Expenses for Mr. McLarnon to obtain treatment for the child's drug and alcohol

addiction, therapy, and recovery from the emotional and psychological abuse which he

suffered because of the actions of the defendants in keeping him from his Father.

**Plaintiff requests a jury trial on all issues so triable.**

Respectfully submitted,
The Plaintiff,    By counsel,

Gregory A. Hession
P.O. Box 1099
42 Jabish Street
Belchertown, MA 01007
(413) 323-7508
BBO No. 564457

# ⊥ EJF Judicial Bias(?) - How It Works and How To Defend Against It by Zed McLarnon

**© 2002** _Zed McLarnon_
**Used with permission of the author**

| EJF Home | Find Help | Join the EJF | Comments? | Get EJF newsletter | Press releases | Author index |

| Courts and Civil Liberties Book | Index-Courts and Liberty |
| Next — The Criminalization Of Fatherhood by Stephen Baskerville |
| Back— We Don't Need Yet Another Court Freed From The Rules Of Fair Trials by Dave Brown |

*The following applies primarily to courts in Massachusetts but courts in other states use many of these same tactics and practices.*

Many men in the fathers and family rights movement complain that they have been victimized by judges who demonstrate extreme bias against them in the courtroom regarding restraining orders and/or child custody. We hear stories from men whose lawyers present what they think is a winning case only to have the judge completely ignore the evidence in favor of the (usually) unsubstantiated accusations of abuse by the (ex-)wife, or girlfriend. Some men complain to the Judicial Conduct Committee (JCC) [in Massachusetts] regarding extreme bias judges have used against them in the courtroom, only to have the JCC exonerate the judge. How can this be? How do they get away with it?

I have been involved in a seven-year struggle to see my son. [1] During that period I have used my experience as a forensic investigator, and a great deal of time to research and then discover, the **criminal** tactics judges and their court personnel use as a basis to support rulings that seem like open discrimination against men/fathers. Here are tips to help you expose the most common crimes used to support the court's blatant bias against fathers. [2]

# Phantom clinical evaluations

*Top*

The answer many times is *"phantom"* clinical evaluations. I call them *"phantom"* because the man/father doesn't know they exist. Here's how it works: A woman goes to Probate & Family Court to obtain a restraining order, and/or custody. A *"victim's advocate,"* usually a lawyer or social worker, is appointed by the court. The woman may, also, see a social worker at the Department of Social Services or privately. These social workers interview the woman and write her accusations down in a report. The social worker does not interview the man accused of abuse or neglect or whatever other complaint the woman is basing her case upon. Since this report is generated by a social worker, it is a *"clinical"* evaluation in the court's eyes, even though the social worker didn't interview both parties - only the woman.

This *"clinical"* evaluation is sent to the court and, since it is clinical in nature, is impounded in the Register's Office impounded files. It does not appear in the case file. Impounded files are clinical in nature and not meant for public scrutiny. Most men do not know of the existence of impounded files. Even if a man goes to court and reviews his case file he doesn't discover that the *"evaluation"* is present and poisoning his case.

Therefore, the man doesn't know that there is a report, or evaluation, that is being seen by the judge. Unless this *"phantom"* evaluation is struck from this case file, the judge who sees it uses it as an excuse to

ignore the evidence of the case in favor of granting the woman a restraining order or custody of the children. When challenged by the Judicial Conduct Committee, the judge pulls out the phantom *"clinical evaluation"* from the impounded files saying this guy is a very bad man and I had to protect the woman and children.

## How to fight it

*Top*

I discovered that phantom clinical evaluations performed by two social workers who worked with my ex-wife's husband had been poisoning my case.

Check your case docket, or have your lawyer obtain a certified copy of the docket, to see if a *"clinical"* evaluation has been submitted to the Court. If there is an entry in the docket that an evaluation has been submitted, you, or your lawyer, must obtain a copy from the Register's Office. The Register's Office is where all material that is *"clinical"* in nature is kept — not in your case file. Even if the docket does not have an entry of the existence of an evaluation or report, go to the Register's Office and request all impounded material having to do with your case. The Register's Office will resist by saying they can't find the file, or a judge may be reviewing it, etc. Be persistent. It is imperative to obtain all impounded material from the Register' Office regarding your case. Once you obtain it, or find out it exists, have your lawyer strike this report, or evaluation, from your file on the grounds that it is **not** *"clinical"* in nature since you weren't interviewed or given an opportunity to offset the report's accusations.

If your attorney does not inform you that a report might exist, or doesn't check the docket or Register's Office for you, your attorney may not be doing everything possible to help you win. Many times a man's attorney will present all the information the man wants in court. But, if your attorney does not check the docket, or request all impounded material from the Register's Office and have the phantom reports struck, even the best of lawyer's arguments are ignored by the judge in favor of the accusations in the phantom report. Attorneys know this and if you haven't requested that your attorney specifically disclose the presence of this report and strike it from the record, then the attorney has done you an injustice. Of course, this leads to you retaining the attorney further to appeal the adjudication or for the next hearing.

I believe most family lawyers know these tricks are being employed and subtly sell their male clients out by, on the one hand, representing them vigorously — while knowing the judge will ignore their arguments in favor of the manipulated court record. The lawyer shrugs his/her shoulder and the man/father wonders what happened. Lawyers are under pressure from the courts to keep these *"tricks"* from being revealed or they will never win another case in front of that court again. For example, my attorney, Greg Hession, submitted to Judge Hiller B. Zobel (of the Louise Woodward *"nanny"* trial) two court-certified copies of my docket six months apart. The second docket had been altered to re-introduce a GAL [Guardian Ad Litem] report that I had previously had stricken. Judge Zobel dismissed my suit and, in his written ruling, threatened Greg that *"if he ever presented evidence like that again he would suffer professional sanctions."*

# Recommendations of the probation officer

*Top*

The court's Probation Officer usually listens to the woman and doesn't even check with the man/father. His recommendation is sent to the judge without the man/father being aware of its existence. For example, men with shared parenting have lost custody and been forced to make child support payments even though their divorce agreement was based on shared parenting without any child support. How does this happen? The judge doesn't look at the divorce agreement and issues the ruling based on the Probation Officer's recommendation. When challenged, the judge can defer to the Probation officer's report.

## How to fight it

*Top*

If you are faced with a situation where your ex-wife is trying to gain sole custody and demands child support, write a Memorandum in Opposition to Plaintiff's Motion for Modification of Custody. Demand to

know of the existence of a Probation Officer's recommendation or report. Do this on the record so that the court is forced to reveal its existence. Then attack the report as unprofessional since you were never interviewed and disclose to the judge that it is based solely on your ex-wife's fraud upon the court. Women are coached to tell the Probation Officer that they have custody and the man is not paying child-support. If the judge ignores your Memorandum and its logic that your ex-wife lied to the Probation Officer, you have an issue upon which to base an appeal.

# Edited court hearing tapes

*Top*

In extreme cases, like mine, your hearing tapes may have been edited to remove the presentation of your evidence in the hearing. These edits, along with the removal of your documentary evidence from your case file, successfully vacuums your evidence from the record. If the appeals court or the Judicial Conduct Committee reviews your case, your evidence supporting your complaint will not be found.

## How to fight it

*Top*

Have a court reporter present for all your hearings. If you are indigent, request the court pay for the reporter.

# Secret hearings

*Top*

My attorney, Greg Hession has discovered that secret hearings have occurred in several cases in which he was involved. My case has at least three secret hearings in which my attorney and I weren't present, but the opposing attorney (my ex-wife's) did meet with the judge. They then come into your hearing knowing exactly how the outcome will be.

## How to fight it

*Top*

Ask the judge and the opposing attorney to put on the record if any ex-parte hearing or meetings occurred regarding your case. Do this right at the beginning of each of your hearings. Watch for *"slips of the tongue"* in hearings. In my and attorney Hession's cases, the judge or the opposing attorney slipped and referred to an event that had occurred in the secret hearing.

# Secret affidavits

*Top*

Massachusetts General Hospital's Psychiatry and the Law Department was my son's court -ordered guardian. They illegally charged me $3,000.00 up front. Massachusetts General Hospital and the court knew that state law mandates if the court orders the evaluation, then the court must pay. After Massachusetts General Hospital found my ex-wife, Virginia Jokisch and her politically-connected social worker husband, David Douglas, were abusing my son, Massachusetts General Hospital reversed themselves and tried to extort money from me under the threat that I would never see my son again. When I refused they started a campaign of submitting secret affidavits to the court without allowing myself or my attorney access to the affidavits.

## How to fight it

Top

Make yourself familiar with:

1. Your case file. Make sure your evidence remains intact. Make sure your file isn't being *"padded"* with bogus evidence that condemns you.

2. Your case docket. Make sure your hearings are all docketed. A common court trick is not to docket your hearing until after the appeal period has lapsed. Then, they docket the hearing and backdate the entry so it seems you let the appeal period lapse. The docket in my case has had illegal deletions and additions made. This is easy to prove because I obtained certified copies of my docket as the case was progressing. It has changed over the years.

3. Your impounded files. These files are located in the Register's Office and are the number one mechanism for social workers to help your ex-wife poison your case with judges.

4. Your hearing's tapes. Obtain a copy and check for edits that remove material beneficial to your case. If you believe your tapes are edited contact me and I can help prove it on my Digital Audio Workstation. I have helped five other men prove their court hearing tapes have been edited.

These tips are intended to help you discover the criminal activity that is widely practiced in the family court system and used to support the **bias** of judges. The first five pages of the December 2000 issue of The Massachusetts News features coverage of the Middlesex Probate & Family Court and how they edited four of my hearings' tapes, manipulated my case docket and hid *"phantom"* evaluations generated by associates of my ex-wife's husband, David Douglas. Mr. Douglas is a politically-connected social worker who founded the batterer's treatment center, Common Purpose, and worked at Emerge, another batterer's center. Harry Stewart was jailed because he wouldn't succumb to the extortion threats of Common Purpose.

Here's what Dr. Stephen Baskerville, of Howard University wrote in the August/ September issue of the Catholic World Report regarding my discoveries:

"Litigants have long claimed that family courts tamper with transcripts and other evidence, but were unable to document their claims until Zed McLarnon, a forensic audio-visual expert, showed photographic evidence that hearing records in his case were being doctored. For his complaint, later aired in the Massachusetts News, McLarnon was assessed $20,000 in fees for attorneys he had not hired, and jailed without trial by the same judges who were responsible for the doctored tapes. The court is currently moving to seize his house and car. His attorney claims the court also *"removed documents from his case file, falsified the case docket, refused to enter motions and hearings in the public record, and withheld the public case file for nine months."* (from What God Has Joined Together. Professor Baskerville is one of the nation's foremost authorities on Family Courts and the Constitution.

---

1. Zed McLarnon has over 20 years experience as a forensic investigator. He can provide help for you to expose edited tapes, dockets, files/impounded files, or any other criminal activity. He can be contacted by telephone at (781) 324-1989 or via email at zed@world.std.com. He uses a Digital Audio Workstation and has corroborated that nine people in four states are victims of criminally edited hearing tapes.

2. This copyrighted article is part of McLarnon's upcoming book *"Of the Lawyers, By the Lawyers and For the Lawyers."*

---

# References

### Newspaper/magazine articles and web sites featuring the kidnapping of Ian McLarnon

Top

Father Sues Court Officials in Federal Court for Kidnapping Son: Zed McLarnon Still Trying To Find Justice in Massachusetts by Ed Oliver, Massachusetts News, June17, 2002.

Full Text of Zed McLarnon 'Complaint' in Federal Court, Massachusetts News,. June 17, 2002.

The Politics of Family Destruction by Dr. Stephen Baskerville, Crisis Magazine, November 4, 2002.

Appeals Court Helps Men Challenge Restraining Orders. Massachusetts News, July 11, 2002.

What God Has Joined Together... by Dr. Stephen Baskerville, Catholic World Report Aug./Sept. 2001.

Biased Courts - Are Family Courts Prejudiced Against Fathers? by Dr. Stephen Baskerville, Insight Magazine, June 18, 2001.

SJC Justice Upset with Problems in Probate Court, But Tells Father to Complain to Chief of Probate Court First by Ed Oliver, Massachusetts News, February 13, 2001.

Another Father Was Punished for Doing What Judge Langlois Suggested — SJC Dismissed Suit Without Looking at Evidence by Ed Oliver, Massachusetts News, January 9, 2001.

Middlesex County Court Charged With Corruption — Who Altered Court Hearing Tapes and Other Records? by Ed Oliver, Massachusetts News, December 2000.

Father Proves That Court Tapes Were Altered by Ed Oliver, Massachusetts News, December 2000.

It's Possible To Tamper With Tapes In Middlesex Probate Court by Ed Oliver, Massachusetts News, December 2000.

Social Workers Discredit Court's Report; Give Startling Admissions by Ed Oliver, Massachusetts News, December 2000.

Douglas' Company Is Infamous to Fathers by Ed Oliver, Massachusetts News, December 2000.

State of Massachusetts is Main Impediment to Justice by Gregory A. Hession, Esq., December 2000.

## Web sites featuring Zed's case

*Top*

American Family Rights Association, Father Sues Court Officials In Federal Court for Kidnapping Son, (one of the first Title 42 Sec. 1983 cases), June 20, 2002.

MassOutrage: Outrageous Restraining Order Cases - Zed McLarnon by Attorney Gregory A. Hession.

*Top*

---

| EJF Home | Find Help | Join the EJF | Comments? | Get EJF newsletter | Press releases | Author index |

| Courts and Civil Liberties Book | Index-Courts and Liberty |
| Next — The Criminalization Of Fatherhood by Stephen Baskerville |
| Back— We Don't Need Yet Another Court Freed From The Rules Of Fair Trials by Dave Brown |

**Last modified 6/28/04**

KIDNAPPING IN MASSACHUSETTS

# State-Sanctioned Kidnapping in Massachusetts

**CASK founder, and forensic investigator Zed Mclarnon's s fight against "state-sanctioned kidnapping ' and the destructive corruption of the "abuse and divorce industries" in the courts and social services.**

In September of 1994, life as I knew it ended. My son, whom I brought up as a stay-at-home dad in a fifty/fifty custody arrangement, was politically kidnapped by way of a state-sanctioned abduction. A relationship, upon which my son depended and I treasured, was vanquished.

My ex-wife's current husband, David Douglas, is a social worker. He is an "abuse expert" who helped found batterers programs EMERGE and COMMON PURPOSE in Boston. He was appointed by to the Governor Weld's Abuse Council. In his affidavit he boasts he trains judges, court personnel and police regarding domestic abuse. His considerable political connections were used to kidnap my son and make a mockery of the judicial system. In 1994, Mr. Douglas and my ex-wife, Virginia Jokisch, filed fraudulent affidavits that falsely accused me of abusing Virginia back in 1983 and 1984. In 1985, Jokisch, herself, broke down and testified under oath that her former boyfriend had caused the physical abuse. Restraining Orders issued on these fraudulent grounds were used as weapons to destroy the loving relationship my son and I shared. Threats were made and ransoms were demanded in the form of fees and court assessments.

Mr. Douglas' partner in the founding of Common Purpose, David Adams, and another social worker Mr. Douglas worked with at EMERGE, Lisa Gary, submitted a clinical evaluation condemning me as an abuser without having met or interviewed me. Douglas demanded I attend - and pay - Emerge or I would never see my son again.

click her to read Massachusetts News article disclosing fraudulent clinical evaluations

Since 1994, important testimony, the presentation of exculpatory evidence and orders by judges in my favor were edited from the official court tapes of Judges Sheila McGovern, William Highgas, Beverly Boorstein and Dorothy Gibson. This tampered evidence was used to frame me as an abuser. Documentation shows that important clinical evidence demonstrating that my ex-wife had been warned to never bring up these false charges (from 1984) again was "vacuumed" from the impounded files in the Register Office and concealed by Register Donna Lambert. The same report "disappeared" from Family Services' impounded files.

*Click here for Mass. News' article disclosing that Court edits tapes, docket and files to frame innocent citizens.*

KIDNAPPING IN MASSACHUSETTS

My son, whom I miss terribly, has suffered greatly since we were separated. In May of 1996, my son came to see me to tell me he was "caught in a plot and can't get out." He told of being controlled by friends of his step-father, Mr. Douglas. Despite the fact that I still retained legal custody, my son was put into the custody of Douglas' fellow social workers in the Department of Social Services without my being notified or involved. This was done as a result of abuse of my son by my ex-wife and her "abuse expert", governor's appointee husband, David Douglas. DSS documented my son's complaints of abuse. Yet, DSS and the Courts chose to look the other way.

My son was unlawfully placed in special education despite a history of fine grades. A minor, he was prosecuted criminally and placed on probation without my being contacted. His Probation Officer was Gilbert Sakakeeny, good friend and professional associate of David Douglas. At thirteen he was seduced by a twenty-one year old woman. While in the custody of DSS, my son was allowed to live in this statutory rape situation as an enticement away from me. Eventually they had a child together. DSS, who had custody, merely avoided the matter. District Attorney Tom Reilly's Office and Attorney General Scott Harshberger's Office refused to address the statutory rape and the obstruction of justice and tampering with evidence in Court. Instead, I was maliciously prosecuted by District Attorney Tom Reilly's Office as a result of my son coming to see me, which he did legally. Tom Reilly's Office dispenced with a show-cause hearing and put me in front of a Judge, which is a violation of "due process of Law". Doctored evidence was used against me. When I showed the court the true documents, the case against me was dismissed.

Three days later, on July 5th, I was dragged from my car, beaten and sent to the hospital by two men, who appeared to be off-duty policemen. They threatened not to return to court if I ever wanted to see my son again.

So, who sent these men to beat me up and threaten my son and me? Was it District Attorney (now Attorney General) Tom Reilly who maliciously prosecuted me using doctored evidence, while violating due process? I taperecorded threats from officers of the Court who worked in Tom Reilly's District Courthouse that warned "Tom Reilly is your enemy and wants to throw you in jail." Attorneys Darin and Karin Collucci, who worked for DA Tom Reilly, delivered the extortion threat that I could get my son back if "nobody did anything wrong."

Was it Tom Reilly who had me beaten, or was it Judges Sheila McGovern, William Highgas or Beverly Boorstein? Documentation shows these judges issued Restraining Orders unlwfully, lied from the bench and their hearing tapes were edited to protect Douglas and Jokisch and frame me as an abuser. Was it my ex-wife and David Douglas? They were discovered to be abusing my son by Court appointed Guardian, Mass. General Hospital? MGH threatened them with a 51A (Child abuse) citation. Records show my son, also, reported their abuse to DSS.

## KIDNAPPING IN MASSACHUSETTS

Who hired the men who beat me? Was it the judges, who are appointed by the Governor, David Douglas, who is a Governor's commissioner on Domestic Violence or former District Attorney, now Attorney General, Tom Reilly? No matter who of the above it was, they are involved in a state-sanctioned racketeering scheme, which uses extortion, tampering with evidence and false clinical reports to frame innocent fathers and/or coerce women to take out false restraining orders. This political agenda destroys families and creates false statistics which they use to obtain your federal tax dollars. This state-sanctioned Racketeering scheme is much worse than any racket set up by the Mafia because these cowards target children and families. As long as these kidnappers are in power, my son and I are in danger. Every day these criminals spend outside of jail is a day your family is in danger. As long as the Court edits tapes and tampers with evidence and judges lie from the bench and ignore the law - no one in Massachusetts is safe!

When I complained about the Court editing my tapes, I was thrown in jail without due process of law by the judges whose tapes were edited. I was a political prisoner. An enemy of the state who committed no crime or did any wrong whatsoever. When I brought a civil suit against my ex-wife and Mr. Douglas in Superior and the Supreme Judicial Court, the judges ignored the medical and scientific evidence presented to them regarding Jokisch's perjury and subornation of perjury from Douglas and his social worker associates. The SJC stood the meaning of the Anti-SLAPP law on its head and assessed me $16,000.00 in attorney's fees as a punishment meant to destroy me and redefine the law to protect all perjury by women. They are currently trying to forclose on my house and car to obtain the $16,000.00.

click here to read Massachusetts News report about how the SJC ignored the evidence presented to them and the recommendation of other judges.

These "abuse experts" who abused my son, their positions and the public trust allege wrongdoing when there is none. They use their professional status to gain credibility while falsifying court records and clinical evaluations. My son has been coerced into living a lie in which not only his father is framed, but, they have also been framing him. His mother and David Douglas wrote to Ian's guardian and put it on the record that Ian is "possibly delusional". Judges, who have helped Mr. Douglas, have stated my son is "a deeply disturbed young man." My son has been separated, not only from me, but from the truth in a cult-like fashion.

Attorney General Tom Reilly's Office and my State Senator's Office refused to help while my son was in State custody. The District Attorney's Office, Inspector General's Office and the Judicial Conduct Committee, all who operate in secret while using public funds, ignored the medical, scientific and eyewitness evidence presented to them regarding the tampering with evidence, coercion and extortion. If we, as a society, support, or at least allow, a destructive cult of "abuse experts" to operate "above the law" with broad-based power, then we foster oppression in government.

KIDNAPPING IN MASSACHUSETTS

Certain rights are professed to be guaranteed in this country. We aspire to an ideal that frees us from complicity and corruption. When the courts and bureaucracies try to overpower us, we can still speak out! By doing so, we can disclose the injustice that allows a situation such as this to exist. Don't let this growing tragedy become an American way of life.

Click here to read about more victims of state-sanctioned kidnapping at the MassOutrage website

Sincerely,

Zed McLarnon

For more information, or if you want to help, contact: zed@world.std.com