Exhibit no. 1

Deposition of **RICHARD FRIES**

1    ride home; I asked Jerry if he could give me a

2    ride home at some point.  At some point or

3    another, I'm not exactly sure how much longer

4    that was, probably another hour Jerry gave me a

5    ride home.

6    Q.  How long were you at the table with Mr. Coviello

7        that night?

8    A.  Probably half an hour.

9    Q.  What, if anything, was he drinking that night?

10   A.  I don't remember specifically what he was

11       drinking.

12   Q.  Do you remember if he was drinking beer?

13   A.  I've seen him there before drinking wine; I

14       can't say for sure that's what he was drinking.

15   Q.  What did you say to Mr. Coviello in terms of

16       going home?

17               MR. SILVERFINE:  Off the record.

18               MR. SILVERFINE:  On the record.

19   Q.  (By Mr. Silverfine)  We were talking about

20       Mr. Coviello, your conversations with him.  Did

21       you request a ride home from him?

22   A.  I believe so, yes.

23   Q.  Tell me what you remember saying to him.

24   A.  It had to have been something like, Bob left and

1       I need a ride home if you can give me a ride

2       home.

3   Q.  He agreed to give you a ride home?

4   A.  Yeah.

5   Q.  At some point in time did Mr. Coviello tell you

6       he was leaving?

7   A.  Yeah.

8   Q.  Approximately what time did that happen?

9   A.  I'm not sure; I'm thinking around 11.

10  Q.  Tell me what you remember happening at that

11      point.

12  A.  Pretty much just leaving and, you know, just

13      exiting the bar.

14  Q.  Did you leave with Mr. Coviello, like, were you

15      walking next to him?

16  A.  I remember him being just a little bit ahead of

17      me and me following him.

18  Q.  What kind of car did he have?

19  A.  He had a Mustang.

20  Q.  Do you recall talking to anyone as you left?

21  A.  No, I don't.

22  Q.  Do you recall seeing a police officer there that

23      night?

24  A.  Yes, I do.

1   Q.   Female police officer?

2   A.   Yes.

3   Q.   Did you say anything to her?

4   A.   I don't remember saying anything to her but I've

5        heard that I did.

6   Q.   What do you recall saying to her?

7   A.   I don't remember what I said to her.

8   Q.   Did someone else tell you you said something to

9        her?

10  A.   That's what I heard, yeah.

11  Q.   Who have you heard it from?

12  A.   First I think I heard it from was her, herself

13       later on that night.

14  Q.   When did you see the officer later?

15  A.   After we got to Jerry's mother's house they took

16       me and put me in a car to bring me to the police

17       station and that girl was, that female police

18       officer was in that car that brought me to the

19       police station.

20  Q.   What did she tell you?

21  A.   She said something like I was harassing her at

22       the bar.

23  Q.   What did you say to her?

24  A.   I said, I was not harassing you.  I mean, if

1  anything, what I felt it was, I sort of was

2  being harassed because, I mean, admittedly I

3  think I was maybe a little bit too drunk but

4  anytime I would look in her direction she would

5  give me this stare like, you know,

6  you're-in-trouble kind of look.

7  Q.  This is at the restaurant?

8  A.  Yes.

9  Q.  You don't recall what you said to her at the

10  restaurant; is that your testimony?

11  A.  Correct.

12  Q.  What did the officer say you said to her?

13  A.  She said I was harassing her.

14  Q.  You said you heard what you allegedly said.

15  What else did you hear as to what you said?

16  A.  Then when they finally released me the next

17  morning two male officers from the police

18  station said, You cannot be harassing our police

19  officers.  And I said, I was not harassing this

20  police officer, and I said, I was not harassing

21  this police officer.  And I was kind of

22  dumbfounded as to where all this was coming from

23  because if I had said something -- well, first

24  of all, I don't remember saying anything.  And

VOL. 1 - 42
RICHARD FRIES

1  Q.  Did you see the officer do anything while you
2      were there?  You said you don't recall any
3      conversation.  Do you recall doing anything?
4  A.  Just staring at me, pretty much.
5  Q.  You left the restaurant with Mr. Coviello and
6      you said you were intoxicated?
7  A.  Yeah.
8  Q.  You got in the Mustang with him?
9  A.  Yes.
10 Q.  It was parked in the parking lot of the Hong
11     Kong?
12 A.  Yes.
13 Q.  When you got in the car what do you remember
14     happening?
15 A.  Just driving down the road and then we went
16     through this intersection where there is a
17     stoplight, we stopped there, then we continued,
18     then blue lights came on from the cruiser, they
19     were pulling us over.  And then I was -- I just
20     stayed in the -- stayed calm and tried to
21     collect myself, not cause any problems because I
22     felt that Jerry was fine to drive.  I didn't
23     know why we were being pulled over.
24 Q.  You were not driving?

1    time, then she got in the car and drove me to

2    the police station.

3  Q.  That's where you were booked, processed?

4  A.  Well, then they didn't actually process me; they

5    just put me in a cell and I was kind of

6    wondering why am I here, I haven't really done

7    anything.  I was asking the officers on several

8    occasions what am I being held for.  They said

9    we're going to keep you here until we find out

10   how this plays out at the house.  It wasn't

11   until the next morning they booked me and

12   processed me and they charged me with those two.

13  Q.  This is those two you got continued without a

14   finding on one of the offenses?

15  A.  Right.

16  Q.  When you're in the car and the car is pulled

17   over with Mr. Coviello and the lights first come

18   on --

19  A.  Yeah.

20  Q.  -- what conversations did you have with

21   Mr. Coviello once the car was pulled over; what

22   was Coviello saying to you?

23  A.  Well, it just -- I don't know if we said

24   anything.  It seemed almost apparent to me we

1  were being pulled over erroneously for no

2  reason.

3  Q.  How do you know that?

4  A.  Because I was watching the way Jerry was

5     driving, driving straight in his arrow -- as an

6     arrow, not exceeding the speed limit or

7     anything.

8  Q.  Once he was stopped and the officer was

9     apparently turning the ignition off, you said he

10    accelerated.  Did you see where the car was in

11    relation to the officers; what happened with the

12    car?

13 A.  Well, he did the U-turn and he kind of swerved

14    but he, you know, came close to the police car

15    but didn't hit it.

16 Q.  You said say he was heading towards the police

17    car and he swerved around it?

18 A.  He did a fast U-turn and he was gaining control

19    to get back in the lane, he wasn't aiming it.

20 Q.  The officers were outside, standing outside

21    their vehicles?

22 A.  I think so, yeah.

23 Q.  How close did he come to them when he did his

24    U-turn and started accelerating?

*Report of Detective Billy Winn*

*Exhibit no. 2*

# Winn Detective Agency
## P.O. Box 1872 Lowell, MA 01853-1872
## Phone 978-689-0375 Fax 978-989-9985

## FAX COVER SHEET

TO: *Att. J Thomas Kerner*

FROM: *Bill Winn*

NUMBER OF PAGES INCLUDING COVER SHEET: *3*

NOTES: *Any questions or any Changes needed please feel free to call*

NOTE:    If you have received this document in error or not in its entirety please notify us at the above listed telephone number.

Thank you.

*W J Winn*

Investigation
Of
Gerald Coviello

For:   Attorney J. Thomas Kerner
From:  William J. Winn
       Private Investigator MA Lic> P903
Date:  May 13, 2004

I have been conducting a criminal investigation for several attorneys regarding Mr. Gerald Coviello since May of 2002. Attorney J. Thomas Kerner recently requested a written report on two matters. One was to conduct an interview with Mr. Moi, a manager at the Hong Kong Restaurant located in Chelmsford, MA and secondly Attorney Kerner wanted to know any information I had pertaining to Gendron's Auto Body Shop, specifically any work records Mr. Al Gendron might have on Cruiser #7 belonging to the Chelmsford Police Department.

I conducted an interview with Mr. Moi in August of 2002 as to anything he might remember as to events that occurred on the evening of August 31, 2001 at the Hong Kong Restaurant between Richard Fries and Gerald Coviello with Officer Fay of the Chelmsford Police Department. Officer Fay was working a detail at the restaurant that evening and wrote a report concerning remarks made to her by Mr. Fries. Mr. Moi advised me that he remembered the incident and he also remembered Officer Fay walking towards the door when Mr. Fries left. Mr. Moi also stated that he saw Officer Fay use her radio.

This investigator wanted to make sure Mr. Moi fully understood what he was saying and so on September 3, 2002 I went back to the Hong Kong Restaurant with Mr. Leon Leung. Mr. Leung is a schoolteacher and speaks the same dialect of Chinese Cantonese as Mr. Moi speaks. Mr. Moi once again advised me that he knew I was a private investigator. He also said he understood that speaking to me was voluntary. Mr. Moi told Mr. Leung the same thing he had told me on my previous visit as to what he remembered about the incident as well as Officer Fay using her radio.

I went to the Chelmsford Police Department on June 13, 2002 and requested to take a picture of Cruiser #7. I was advised that no one was available at the time and I should have the district attorneys Office contact the Chelmsford Police Department to advise them that it was ok for me to view Cruiser #7 and take pictures. I then contacted ADA Barton and was told he would call the Chelmsford Police and advise them that he had no objections to me viewing Cruiser #7. On 6/18/02 I went back to the Chelmsford Police and was advised by Lt. Scott Ubele that the cruiser was at Al Gendron's Body Shop being repaired. I then went to Gendron's and was advised that Cruiser #7 was repaired for rear end damage several weeks earlier. I went back to the Chelmsford Police and Lt. Ubele radioed Cruiser #7 to report to the station.

I observed Cruiser #7 and it was recently painted and did not have any marks on it. I later went back to Al Gendron's Body Shop and was advised by Mr. Gendron that when he repaired the cruiser he observed a mark the length of the driver's side of Cruiser #7. Mr. Gendron further stated that he just buffed out the mark and did not charge the Chelmsford Police Department for the work because he felt he does all the bodywork for the Chelmsford Police Department and that the mark was not significant enough to charge. It was not a big job an and Mr. Gendron also stated he could not find any work order in his files on work he did on Cruier#7 which is why he could not produce any paperwork.

Exhibit no. 4

# LILLIAN M. CLARK

124 W. Main Street, #33
Merrimac, MA  01860-2250
(978) 346-9901

September 9, 2001

Attorney Scott Bratton
Lowell, MA

Dear Mr. Bratton

I am writing in regards to Gerald Coviello and statements that have been made in regards to the charges against him. This incident involving Gerry has taken us by surprise, having known him as a quiet and private individual.

Although, my acquaintance with Gerry is only through being a friend to his mother, I know that this is completely out of character with his personality. Due to the ill health of his mother, my husband and myself were quite concerned about the stress to Penny and stopped in the next evening to speak with her. After learning of what took place and statements made by the Chelmsford Police to Penny, my husband and I went out purposely to check Gerry's automobile for Penny. We discovered that all lights; headlights, taillights, stop lights, etc., were in fine condition. We also noted that the car being an older model Mustang, that there was no damage done to the vehicle. Therefore, we were quite taken back when we read the reports of him hitting a police vehicle and more so confused when it was stated that he was stopped due to a taillight being out. None of these statements made sense to us, having checked out the automobile ourselves.

If we can be of any assistance in this matter, please contact us. Thank you for your time.

Sincerely,

*[signature: Lillian M. Clark]*

Lillian M. Clark

*there is a notary seal here on original*

*The above named Lillian M. Clark appeared before me this 9th day of September 2001*

*Elaine V. Marsella*

My Commission Expires August 30, 2002

United States District Court
District of Massachusetts

Jerry Coviello
    plaintiff

V.                              CA# 04-11901-MLW

Town of Chelmsford
    Chelmsford, P.D.
        et al, Defendants

dated; Feb 26th 2007

_____

AFFidavit of Jerry Coviello

1. My name is Jerry Coviello I am a Pro-Se plaintiff in this civil action.

2. I was at the deposition of lillian Clark and she reiterated, under oath, what is stated in her letter.

3. This letter, signed by her, is an accurate representation of her statements at her deposition, taken 9-28-05.

pg 1

4. I requested a copy of the deposition on thursday Feb 22nd 2007. The stenographer <u>Dunn & Goudreau</u> said they can not provide the copy in time. I have asked Mr. Silverfine for a copy of the deposition which I have offered to pay for.

Signed under pains and penalties of perjury this 26th day of February 2007

Jerry Coviello

ph: 978.771.3061

978.884-8513

Jerry Coviello Pro-SE
86 Richardson Rd - no 1
N. Chelmsford, MA. 01863

Pg 2

Exhibit no. 5

6/9/05

**COMMONWEALTH OF MASSACHUSETTS**

MIDDLESEX, SS.                                    LOWELL DIST. COURT

⑪

GERALD COVIELLO,                    )
                                    )
        Plaintiff,                  )
                                    )        CIVIL DOCKET NO.
V.                                  )        04/11/CV/1151
                                    )
MICHAEL HORAN                       )
                                    )
        Defendant.                  )

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now comes the plaintiff and, pursuant to M.R.Civ.P. 56,
moves this Honorable Court to enter judgment in favor of the
plaintiff.

On count 1 the Court should rule that the defendant
assaulted and battered the plaintiff and should order the
defendant to pay the plaintiff $100.00 to compensate him for
the pain he experienced when he was assaulted and battered
by the defendant.

In Support of this motion the plaintiff files a
memorandum of law and his affidavit.

                              **Respectfully Submitted,**

                              **GERALD COVIELLO**
                              **By his attorney:**

MOTION ALLOWED

DATE _____          **J. Thomas Kerner**
                               **BBO# 552373**
JUSTICE _____       **Attorney at Law**
                               **230 Commercial Street, 1ˢᵗ Fl.**
                               **Boston, MA  02109**
                               **(617) 720-5509**

11/38/2004  19:38  6177288787

Filed
8/3/05
of

PAGE  02

14

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                              LOWELL DIST. COURT

GERALD COVIELLO,                  )
                                  )
        Plaintiff,                )
                                  )        CIVIL DOCKET NO.
v.                                )        04/11/CV/1151
                                  )
MICHAEL HORAN                     )
                                  )
        Defendant.                )

## STIPULATION OF JUDGMENT

Now come the parties and stipulate that this Honorable
Court should enter a judgment for the plaintiff against the
defendant in the amount of $100.00.

The parties stipulate that an amount of $100.00
represents a sum sufficient to compensate the plaintiff for
the injuries, as alleged in the complaint, which were caused
by the defendant on September 1, 2001.

Additionally, by stipulating to this judgment the
parties agree that this judgment satisfies any claims the
plaintiff may have against the defendant for all injuries to
the plaintiff for any and all conduct by the defendant for
all time up to and including December 3, 2004.



*Exhibit no. 6*



# FORENSIC ENGINEERS & TECHNOLOGISTS

**John M. Orlowski, P.E., CSP, BCFE, Director**
11 Vanderbilt Avenue, Suite 120
Norwood, Massachusetts 02062-5056

PHONE: (781)762-8377
FAX: (781)762-1862
general@fet-forensics.com
www.fet-forensics.com

*Report of Zed Mclamon.*

August 16, 2005

**TECHNICAL REPORT TO**
Thomas J. Kerner, Esquire
232 Commercial Street
First Floor
Boston, MA 02109

RE:    Gerald Coviello
F.E.T. File No.: 3116.6-P

**POLICE INCIDENT**
The night of August 31/September 1, 2001.

**KEY PERSONNEL**
Lieutenant Scott R. Ubele – Chelmsford Police Department
Scott Bratton – one of Mr. Coviello's previous attorneys
Mr. Kenneth Rich, Technical Analyst for Witness Systems
Robert T Wyman and Richard N. Foley – previous attorneys for Mr. Coviello
Mr. Moi - manager of the Hong & Kong Restaurant

## 1.0    BACKGROUND
Attorney Tom Kerner contacted F.E.T. regarding his client, Mr. Gerald Coviello, in December 2004. I, the undersigned, was assigned to the case.

### 1.1    Initial meeting
I spoke with attorney Thomas Kerner regarding his client, Mr. Gerald Coviello, a defendant whom he represented in a criminal case brought by the Chelmsford Police Department. Attorney Kerner explained that his client believed the Chelmsford Police dispatch audio recording had been edited. I arranged for Mr. Coviello and I to meet.

F.E.T. FILE NUMBER:  3116.6-P

## 5.0    CONCLUSION

The four recordings provided to defense counsel in the Coviello matter are manufactured recordings by way of edits.  The physical evidence also indicates that the Master Turret Tape that exists at the Chelmsford Police Department is also a manufactured tape – by way of edits.

### 5.1    The Bratton Cassette Recording

**5.1.1** Section 4.1.2 of this report, along with APPENDICES 9 – 17, details the physical evidence of edits that appear on The Bratton Cassette.  This cassette was made from the Master Turret Tape on 8.11.04.  This was presumably before the Chelmsford police had purchased a digital audio program capable of editing in April/May of 2005.   The reason for all of the breaks in the recording seems to be as a result of the Master Turret Tape being stopped at every transmission by, or about, police officer Fay regarding Mr. Coviello.

### 5.2    The Coviello State Data File Recording

**5.2.1** Section 4.1.3 of this report, along with APPENDICES 18 – 20, documents that the beginning of the Coviello State Data File recording provided to defense counsel in May, 2005 is not a real-time copy of the Master Turret Tape.  It contains edits and discrepancies that are shown in APPENDICES 18 – 20.

**5.2.2 Transcript of Transmission – APPENDIX 20**
The Coviello State Data File CD- ROM that was provided to defense counsel in May, 2005 has several repeated sections that are detailed in Section 4.1.4 of this report, revealing large sections of the recording that were repeated by way of edits.  The same is true for the Tape#2District Atty. recording.

**5.2.3 The Coviello 6.16 Audio CD and the Master Turret Tape**
The Coviello 6.16 recording was provided to me as an Audio CD on June 16, 2005 after I witnessed Lt. Ubele record it from the Master Turret Tape.  It indicates that the Master Turret Tape, itself, is edited to remove the same transmissions as The Bratton Cassette recording.  The Bratton Cassette recording was not a real-time copy of the Master Turret Tape because it was stopped in many places, creating many breaks in the recording.  Presumably, with the testimonial evidence presented by Mr. Moi and Mr. Coviello, these breaks in the recording were made as a result of stopping the Master Turret Tape to delete the transmissions by, or  about, Police Officer Fay.   Therefore, it is my professional opinion