Exhibit no. 1

Deposition of                    VOL. 1 - 39
                                 RICHARD FRIES

```
 1   Q.   Female police officer?

 2   A.   Yes.

 3   Q.   Did you say anything to her?

 4   A.   I don't remember saying anything to her but I've

 5        heard that I did.

 6   Q.   What do you recall saying to her?

 7   A.   I don't remember what I said to her.

 8   Q.   Did someone else tell you you said something to

 9        her?

10   A.   That's what I heard, yeah.

11   Q.   Who have you heard it from?

12   A.   First I think I heard it from was her, herself

13        later on that night.

14   Q.   When did you see the officer later?

15   A.   After we got to Jerry's mother's house they took

16        me and put me in a car to bring me to the police

17        station and that girl was, that female police

18        officer was in that car that brought me to the

19        police station.

20   Q.   What did she tell you?

21   A.   She said something like I was harassing her at

22        the bar.

23   Q.   What did you say to her?

24   A.   I said, I was not harassing you.  I mean, if
```

Exhibit no. 2                    pg¹

# Investigation
## Of
### Gerald Coviello

For:   Attorney J. Thomas Kerner
From:  William J. Winn
       Private Investigator MA Lic> P903
Date:  May 13, 2004

Pg 3

1. I have been conducting a criminal investigation for several attorneys regarding Mr.
2. Gerald Coviello since May of 2002. Attorney J. Thomas Kerner recently requested a
3. written report on two matters. One was to conduct an interview with Mr. Moi, a manager
4. at the Hong Kong Restaurant located in Chelmsford, MA and secondly Attorney Kerner
5. wanted to know any information I had pertaining to Gendron's Auto Body Shop,
6. specifically any work records Mr. Al Gendron might have on Cruiser #7 belonging to the
7. Chelmsford Police Department.

8. I conducted an interview with Mr. Moi in August of 2002 as to anything he might
9. remember as to events that occurred on the evening of August 31, 2001 at the Hong Kong
10. Restaurant between Richard Fries and Gerald Coviello with Officer Fay of the
11. Chelmsford Police Department. Officer Fay was working a detail at the restaurant that
12. evening and wrote a report concerning remarks made to her by Mr. Fries. Mr. Moi
13. advised me that he remembered the incident and he also remembered Officer Fay
14. walking towards the door when Mr. Fries left. Mr. Moi also stated that he saw Officer
15. Fay use her radio.

16. This investigator wanted to make sure Mr. Moi fully understood what he was saying and
17. so on September 3, 2002 I went back to the Hong Kong Restaurant with Mr. Leon Leung.
18. Mr. Leung is a schoolteacher and speaks the same dialect of Chinese Cantonese as Mr.
19. Moi speaks. Mr. Moi once again advised me that he knew I was a private investigator.
20. He also said he understood that speaking to me was voluntary. Mr. Moi told Mr. Leung
21. the same thing he had told me on my previous visit as to what he remembered about the
22. incident as well as Officer Fay using her radio.

I went to the Chelmsford Police Department on June 13, 2002 and requested to take a
picture of Cruiser #7. I was advised that no one was available at the time and I should
have the district attorneys Office contact the Chelmsford Police Department to advise
them that it was ok for me to view Cruiser #7 and take pictures. I then contacted ADA
Barton and was told he would call the Chelmsford Police and advise them that he had no
objections to me viewing Cruiser #7. On 6/18/02 I went back to the Chelmsford Police
and was advised by Lt. Scott Ubele that the cruiser was at Al Gendron's Body Shop
being repaired. I then went to Gendron's and was advised that Cruiser #7 was repaired
for rear end damage several weeks earlier. I went back to the Chelmsford Police and Lt.
Ubele radioed Cruiser #7 to report to the station.

I observed Cruiser #7 and it was recently painted and did not have any marks on it. I
later went back to Al Gendron's Body Shop and was advised by Mr. Gendron that when
he repaired the cruiser he observed a mark the length of the driver's side of Cruiser #7.
Mr. Gendron further stated that he just buffed out the mark and did not charge the
Chelmsford Police Department for the work because he felt he does all the bodywork for
the Chelmsford Police Department and that the mark was not significant enough to
charge. It was not a big job an and Mr. Gendron also stated he could not find any work
order in his files on work he did on Cruier#7 which is why he could not produce any
paperwork.

*Attached to 5* EX 3

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                                    SUPERIOR COURT
                                                 INDICTMENT NOS.
                                                 MICR2001-01129

COMMONWEALTH OF MASSACHUSETTS

v.

GERALD COVIELLO

## AFFIDAVIT OF BILL WINN

Now comes Bill Winn and attests to the following:

1.  I have been told by a witness present at the Hong Kong
    Restaurant the evening of August 31/September 1, 2001 that
    Officer Fay and Richard Fries had an oral confrontation when
    Fries was leaving the Restaurant.  Immediately after Fries
    left the Restaurant, ████████████████████████████████
    ████████████████

    I have reviewed an incident report by Officer Fay concerning
    the August 31/September 1, 2001 incident.  The report
    references the verbal confrontation between herself and
    Richard Fries.  Gratuitously, Officer Fay stated in her
    report that "due to the time in between departures [of Fries
    and defendant Coviello] [Fay] was unaware of the fact that
    the [sic.] Gerald Coviello and Richard Fries were together.
    At no time did [Fay] radio to any patrol units on the road
    about who was leaving the restaurant or about any problems
    [Fay] had encountered inside the restaurant."

2.  I was informed by attorney Robert Wyman that he spoke to ADA
    Steve Barton concerning Chelmsford Police Cruiser 7.
    According to Attorney Wyman, ADA Barton instructed the
    Chelmsford Police to not repair any damage to the cruiser
    allegedly caused by the defendant, Gerald Coviello.

    In June 2002, I was informed by Attorney Wyman that we had
    been given authorization to inspect the cruiser.  When I
    went to inspect the cruiser I was informed that the police
    had not been notified to permit the cruiser to be inspected.

    I was told by Attorney Wyman that the District Attorney's
    office again contacted the Chelmsford Police and instructed
    the police to allow me to inspect the cruiser.

PAGE  03

*ATTACHED no. 5 pg 2*

When I again went to inspect the cruiser, I was advised that
the cruiser was being repaired at Al Gendron's Body Shop.
So, I went to the Gendron facility.  At Gendron I was
informed that the cruiser had been repaired.

I returned to the Chelmsford Police a third time and
informed Lt. Ubele what I had been told at Gendron.  Lt.
Ubele radioed Cruiser 7 to report to the station.  When the
cruiser arrived I observed a freshly painted cruiser with no
marks on it.

Sworn to under the pains and penalties of perjury on this ___
day of May, 18 2004.

William P. Winn
**Winn Detective Agency**

*Exhibit 4*

POLICE OFFICER'S FORMAL REPORT                09/03/01 16:55
CHELMSFORD POLICE DEPT                                    PAGE: 6

Case#:   177921
------------------------------------------------------------------------

### *** NARRATIVE ***

RIGHT TURN ONTO CHELMSFORD ST BEHIND THE MV. I THEN
ACTIVATED THE OVERHEAD EMERGENCY LIGHTS ON CAR-6 WHEN IT
WAS SAFE TO DO SO, AT THE INTERSECTION OF CHELMSFORD ST AND
FLETCHER ST. I THEN ACTIVATED THE SIREN ON CAR-6.
APPROXIMATELY A QUARTER OF A MILE THE MV WITH MASS REG
9270D I PULLED OVER TO THE RIGHT HAND SIDE OF CHELMSFORD ST
INFRONT OF PAPA GINO'S. WHILE IN THE PROCESS OF STOPPING
THE MV, A 1967 FORD MUSTANG, I OBSERVED THE MV DRIFTING
OVER THE DOUBLE YELLOW LINES BEFORE COMING TO A STOP. OFC
HANNAGAN WHO WAS ON PATROL IN CAR-7 AND SGT SPINNEY WHO WAS
IN CAR-9X ALSO ASSISTED ME (OFC HORAN) IN THE MV STOP. I
MADE CONTACT WITH THE VEHICLE OPERATOR WHO PRODUCED A VALID
MASS DRIVERS LICENSE IDENTIFYING HIM AS GERALD COVIELLO. I
THEN EXPLAIN TO THE OPERATOR THE PURPOSE FOR THE MV STOP.
CAVIELLO THEN STATED THAT HIS MV WAS FINE AND THEIR WAS NO
PROBLEM WITH HIS MV. WHILE CAVIELLO WAS TELLING ME THIS I
COULD SMELL AN EXTREME ODOR OF ALCOHOL COMING FROM THE MV.
I KNEW THIS TO BE ALCOHOL THROUGH MY TRAINING AND
EXPERIENCE AT THE LOWELL POLICE ACADEMY. I THEN ASKED
COVIELLO IF HE HAD ANY ALCOHOL TO DRINK THIS EVENING.
COVIELLO STATED THAT HE HAD A COUPLE OF BEERS. I THEN ASKED
COVIELLO TO TURN HIS MV OFF. COVIELLO STATED HE COULD NOT
BECAUSE THE VEHICLE WOULD NOT RESTART. I THEN INSTRUCTED
COVIELLO THAT WE WOULD GIVE HIM A JUMP START IF THE VEHICLE
WOULD NOT RESTART. COVIELLO STATED, IN AN AGGRESSIVE
MANNER, THAT HE WOULD NOT SHUT THE VEHICLE OFF. SGT
SPINNEY, WHO WAS STANDING TO MY RIGHT, INSTRUCTED COVIELLO
TO EXIT THE MV, IN ORDER TO DUE A SERIES OF FIELD SOBRIETY
TESTS ON COVIELLO. COVIELLO THEN STATED, IN AN AGGRESSIVE
VOICE, THAT HE WAS NOT EXITING THE MV. I THEN ATTEMPTED TO
OPEN THE DRIVERS DOOR, WHICH WAS LOCKED. AT THAT POINT
COVIELLO PLACED THE MV INTO DRIVE. COVIELLO THEN MADE AN
IMMEDIATE U-TURN ON CHELMSFORD ST WITH NO REGARD TO PUBLIC
SAFETY. SGT SPINNEY AND I MADE SEVERAL ATTEMPTS INSTRUCTING
COVIELLO NOT TO LEAVE THE MV STOP. COVIELLO WAS HEADED
TOWARDS LOWELL ON CHELMSFORD ST. OFC HANNAGAN, SGT SPINNEY,
AND MYSELF, PROCEEDED TO PURSUE COVIELLO, WITH FULL
EMERGENCY LIGHTS AND SIRENS ACTIVATED ON THE CARS.
        COVIELLO PROCEEDED DOWN CHELMSFORD ST TRAVELLING
63MPH, WHICH WAS CLOCKED USING THE RADAR OF CAR-6. WHILE
PURSUING COVIELLO, I OBSERVED HIM MAKE AN ILLEGAL PASS OF
THREE MOTOR VEHICLES AND TAKE A LEFT HAND TURN ONTO
STEADMAN ST. WHEN COVIELLO PASSED THE MV'S HE CROSSED OVER
A SOLID DOUBLE YELLOW LINE. COVIELLO MADE THE TURN ONTO
STEADMAN ST FROM THE LEFT HAND SIDE OF THE ROAD, THUS
TURNING INFRONT OF ONCOMING TRAFFIC. COVIELLO THEN
PROCEEDED UP STEADMAN ST AT A SPEED OF 54MPH. I KNEW THIS
FROM THE RADAR UNIT ON CAR-6. COVIELLO THEN PROCEEDED
THROUGH THE STOP SIGN AND FLASHING RED LIGHT AT THE
INTERSECTION OF STEADMAN ST AND DALTON RD, WITHOUT STOPPING
OR ATTEMPTING TO STOP. WHILE COVIELLO WAS TRAVELING ON
STEADMAN ST TOWARDS LOWELL, HE CAME TO AN ABRUPT STOP AND
TURNED INTO THE DRIVEWAY OF NUMBER 52 STEADMAN ST. OFC

Exh 5

6/9/05

11

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                          LOWELL DIST. COURT

GERALD COVIELLO,                    )
                                    )
        Plaintiff,                  )
                                    )         CIVIL DOCKET NO.
V.                                  )         04/11/CV/1151
                                    )
MICHAEL HORAN                       )
                                    )
        Defendant.                  )

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now comes the plaintiff and, pursuant to M.R.Civ.P. 56, moves this Honorable Court to enter judgment in favor of the plaintiff.

On count 1 the Court should rule that the defendant assaulted and battered the plaintiff and should order the defendant to pay the plaintiff $100.00 to compensate him for the pain he experienced when he was assaulted and battered by the defendant.

In Support of this motion the plaintiff files a memorandum of law and his affidavit.

                          Respectfully Submitted,

                          GERALD COVIELLO
                          By his attorney:

MOTION ALLOWED

DATE _____ 6-5-05

JUSTICE _____

                          J. Thomas Kerner
                          BBO# 552373
                          Attorney at Law
                          230 Commercial Street, 1st Fl.
                          Boston, MA 02109
                          (617) 720-5509

COPY

11/30/2004  19:38  6177200707                                    PAGE  02

Filed
8/3/05
Of

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                LOWELL DIST. COURT

GERALD COVIELLO,                       )
                                       )
        Plaintiff,                     )
                                       )        CIVIL DOCKET NO.
v.                                     )        04/11/CV/1151
                                       )
MICHAEL HORAN                          )
                                       )
        Defendant.                     )

### STIPULATION OF JUDGMENT

Now come the parties and stipulate that this Honorable Court should enter a judgment for the plaintiff against the defendant in the amount of $100.00.

The parties stipulate that an amount of $100.00 represents a sum sufficient to compensate the plaintiff for the injuries, as alleged in the complaint, which were caused by the defendant on September 1, 2001.

Additionally, by stipulating to this judgment the parties agree that this judgment satisfies any claims the plaintiff may have against the defendant for all injuries to the plaintiff for any and all conduct by the defendant for all time up to and including December 3, 2004.



Respectfully Submitted,

GERALD COVIELLO
By his attorney:

J. THOMAS KERNER
BBO# 552373
Attorney at Law
230 Commercial Street, 1st Fl.
Boston, MA  02109
(617) 720-5509

Respectfully Submitted,

MICHAEL HORAN
By his attorney:

DANIEL J. WILKINS
BBO#
Attorney at Law
92 Chelmsford Street
Chelmsford, MA 01824
(978) 230-4424

2


COPY

$Exhibit$ ?

## 5.0 CONCLUSION

The four recordings provided to defense counsel in the Coviello matter are manufactured recordings by way of edits. The physical evidence also indicates that the Master Turret Tape that exists at the Chelmsford Police Department is also a manufactured tape – by way of edits.

### 5.1 The Bratton Cassette Recording

5.1.1 Section 4.1.2 of this report, along with APPENDICES 9 – 17, details the physical evidence of edits that appear on The Bratton Cassette. This cassette was made from the Master Turret Tape on 8.11.04. This was presumably before the Chelmsford police had purchased a digital audio program capable of editing in April/May of 2005. The reason for all of the breaks in the recording seems to be as a result of the Master Turret Tape being stopped at every transmission by, or about, police officer Fay regarding Mr. Coviello.

### 5.2 The Coviello State Data File Recording

5.2.1 Section 4.1.3 of this report, along with APPENDICES 18 – 20, documents that the beginning of the Coviello State Data File recording provided to defense counsel in May, 2005 is not a real-time copy of the Master Turret Tape. It contains edits and discrepancies that are shown in APPENDICES 18 – 20.

#### 5.2.2 Transcript of Transmission – APPENDIX 20

The Coviello State Data File CD- ROM that was provided to defense counsel in May, 2005 has several repeated sections that are detailed in Section 4.1.4 of this report, revealing large sections of the recording that were repeated by way of edits. The same is true for the Tape#2District Atty. recording.

#### 5.2.3 The Coviello 6.16 Audio CD and the Master Turret Tape

The Coviello 6.16 recording was provided to me as an Audio CD on June 16, 2005 after I witnessed Lt. Ubele record it from the Master Turret Tape. It indicates that the Master Turret Tape, itself, is edited to remove the same transmissions as The Bratton Cassette recording. The Bratton Cassette recording was not a real-time copy of the Master Turret Tape because it was stopped in many places, creating many breaks in the recording. Presumably, with the testimonial evidence presented by Mr. Moi and Mr. Coviello, these breaks in the recording were made as a result of stopping the Master Turret Tape to delete the transmissions by, or about, Police Officer Fay. Therefore, it is my professional opinion

$Exhibit \ 6$

VOL. 1 - 1
LILLIAN CLARK

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 04-11901-MLW

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

```
                                        )
JERRY COVIELLO,                         )
     Plaintiff,                         )
                                        )
          vs.                           )
                                        )
TOWN OF CHELMSFORD,                     )
CHELMSFORD POLICE DEPARTMENT, ET AL.,   )
     Defendants.                        )
                                        )
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LILLIAN CLARK, taken on

behalf of the Defendant, pursuant to the applicable

provisions of the Massachusetts Rules of Civil

Procedure, before June N. Poirier, Shorthand Reporter

and Notary Public within and for the Commonwealth of

Massachusetts, at the Chelmsford Police Station,

One Olde North Road, Chelmsford, Massachusetts,

on Wednesday, September 28, 2005, commencing

at 12:20 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
(617) 742-6900

VOL. 1 - 2
LILLIAN CLARK


APPEARANCES:

JERRY COVIELLO, PRO SE
71 North Road
Chelmsford, MA 01824
(978) 256-1986
      Represents Jerry Coviello

JEREMY I. SILVERFINE, ESQ.
Brody, Hardoon, Perkins & Kesten
One Exeter Plaza
Boston, MA 02116
(617) 880-7100
      Represents Town of Chelmsford
                Chelmsford Police Department

VOL. 1 - 3
LILLIAN CLARK

## I N D E X

WITNESS                  DIRECT          CROSS

LILLIAN CLARK

    By Mr. Silverfine      4

    By Mr. Coviello                        21

## E X H I B I T S

EXHIBIT NO.          DESCRIPTION        PAGE NO.


NO EXHIBITS WERE MARKED

1                          PROCEEDINGS

2              (Whereupon the Witness was sworn.)

3        DIRECT EXAMINATION

4    Q.  (By Mr. Silverfine)  Good afternoon, Miss Clark.

5        My name is Jerry Silverfine; I represent the

6        Chelmsford Police Department and several police

7        officers in a case titled Jerry Coviello versus

8        Town of Chelmsford, et al., that's been filed in

9        the United States District Court.

10             We're here to take your deposition today

11       and I'll lay out some of the ground rules and

12       we'll explain to you what's going to happen.

13             There is a stenographer to your left that

14       takes down questions and answers, as well as any

15       questions Mr. Coviello has once I'm finished.

16       You're obliged to answer them.

17             If there is anything you don't understand,

18       let us know.

19             If you need to take a break, use the

20       ladies' room, water, let us know.  I'll try to

21       be as efficient as possible.  You can't shake

22       your head or say "huh-huh," you have to give an

23       affirmative response to a question I ask.  Do

24       you understand?

1    A.    Yes.

2    Q.    Once we finish, a transcript will be made and

3          you'll have an opportunity to review the

4          transcript and fill out what's called an errata

5          sheet if there are any changes or anything you

6          feel is appropriate, you can sign it and fill it

7          out and return it.  If you don't do it within 30

8          days of receipt it will be waived and the

9          transcript goes in as is.  Do you understand

10         that?

11   A.    Yes, I do.

12   Q.    Could you tell us your full name?

13   A.    Lillian M. Clark.

14   Q.    Miss Clark, where do you live?

15   A.    I live at 124 West Main Street in Merrimac,

16         Mass.

17   Q.    How long have you lived there?

18   A.    Ten, almost eleven years.

19   Q.    Who do you live with?

20   A.    My husband.

21   Q.    What's his name?

22   A.    Richard Clark.

23   Q.    Are you employed?

24   A.    Self-employed.

1    Q.   What do you do?

2    A.   Real estate broker.

3    Q.   How long have you been a real estate broker?

4    A.   God, I've got to stop and think; about 17 years.

5    Q.   Okay.  What's the name of the company?

6    A.   Licensed out of ERA Morrison.

7    Q.   Sorry?

8    A.   ERA Morrison.

9    Q.   What is their address?

10   A.   That's in Dracut, 1688 Bridge Street.

11   Q.   You sell residential?

12   A.   Residential.

13   Q.   What does your husband do?

14   A.   He's retired.

15   Q.   What did he do?

16   A.   He was a computer programmer manager.

17   Q.   For what?

18   A.   For Malden Mills in Lawrence.

19   Q.   How long did he do that?

20   A.   Forty-three years.

21   Q.   Prior to being self-employed as a real estate

22        broker did you work at all?

23   A.   Yes, I worked at Wang.

24   Q.   What did you do for Wang?

1    A.   I was a supervisor, photo composition

2         department.

3    Q.   How long did you work there?

4    A.   I was at Wang for seven years.

5    Q.   You left there because?

6    A.   I left there -- because the company was closing

7         down -- with the other 5,000 people.

8    Q.   What did you do prior to Wang?

9    A.   Prior to Wang I worked at Frank Thompson, which

10        was also closed.

11   Q.   What is that?

12   A.   A graphic company.

13   Q.   How long did you work for them?

14   A.   Three years.

15   Q.   Prior to that?

16   A.   Prior to that was Shaw Print.  I'm really

17        digging here.

18   Q.   What did you do for Shaw Print?

19   A.   Same thing, photo composition.

20   Q.   How long did you work there?

21   A.   Two years before.

22   Q.   Can you tell us your educational background?

23   A.   High school, three years of college.

24   Q.   Where did you go to high school?

1  A.  Dracut High.

2  Q.  Where did you go to college?

3  A.  All over.  Northeast, Fitchburg.

4  Q.  Did you ever receive a degree?

5  A.  No.

6  Q.  After you did your three years all over you

7      started to work?

8  A.  Yes.  Well, I shouldn't say that; after I got

9      through there I worked at Raytheon and then I

10     went to Vista.

11 Q.  You were in Vista?

12 A.  I was in Vista for three years.

13 Q.  What did you do for Vista?

14 A.  Organized a health service, birth control,

15     things like that; still going on, various

16     things.

17 Q.  Do you have any criminal record?

18 A.  None that I know of they found me for, no.

19 Q.  How do you know Mr. Coviello?

20 A.  Close friends with his mother.

21 Q.  How many years have you known his mother?

22 A.  His mother, about five to six.

23 Q.  Five to six years.  Did you know her personally?

24 A.  I met her through business and then personally.

VOL. 1 - 9
LILLIAN CLARK

1    Q.    You became friends?

2    A.    Very close friends.

3    Q.    Did you get to know Jerry Coviello?

4    A.    I basically knew Jerry coming and going at the

5          house.

6    Q.    The house at Steadman Street?

7    A.    Yes.

8    Q.    You had been there before?

9    A.    Yes.

10   Q.    Were you aware that Jerry owned a number of

11         guns?

12   A.    No.

13   Q.    Had you ever been to the basement?

14   A.    No.

15   Q.    Were you aware there was a shooting gallery, for

16         lack of a better word, in the basement?

17   A.    No.

18   Q.    Do you have any training or experience in the

19         area of automobiles?

20   A.    I used to work on my own car, if that counts.

21   Q.    What kind of work did you do on your own car?

22   A.    I did a valve job, I used to do ignitions, tooth

23         brushes, things like that.

24   Q.    Oil changes?

1   A.   Yeah.  When I was poor I had to do my own work.

2   Q.   Besides working on your own car, do you have any

3        background in automobiles?

4   A.   No.

5   Q.   Ever work in any station?

6   A.   No; trained by my father.

7   Q.   Besides the work on your own car, any other

8        background, training, courses you took,

9        certificates you might have received in terms of

10       automobiles?

11  A.   No.

12  Q.   Were you familiar with the car Mr. Coviello was

13       driving on or about August 31st, 2001?

14  A.   Yes.

15  Q.   What kind of car was he driving?

16  A.   Mustang.

17  Q.   Do you remember the make, model?

18  A.   Well, it's a Ford Mustang, obviously.  No, just

19       that it was an older model.

20  Q.   Prior to September 9th, 2001, did you examine

21       that vehicle prior to September 9th, 2001?

22  A.   No.

23  Q.   Did you know what condition it was as of

24       August 31st, 2001?

1   A.  No.

2   Q.  Had you ever examined the vehicle prior to

3       September 9th, 2001?

4   A.  September 9th is when I wrote the letter. And I

5       don't have dates; I don't remember dates. It

6       was the day after this situation took place,

7       that's all I can tell you.

8   Q.  So if this incident took place on the night of

9       August 31st, the Friday into September 1st --

10   A.  Then following then; September 1st.

11   Q.  If I represent September 1st as a Saturday, when

12       would you have --

13   A.  Okay. Then -- It's been so long now. It was

14       immediately following this incident that took

15       place but whether it was, like, Saturday or

16       Sunday, I can't tell you; I don't recall.

17   Q.  You don't have a memory as to when you went to

18       look at the car?

19   A.  Yes. It was after we heard about this incident;

20       I'm not sure if it was Saturday or Sunday.

21       After we heard about this incident we were

22       concerned about Penny due to the fact that she

23       was ill with cancer and I was involved with her

24       care. And my husband and I had gone over to

1          check on Penny after we heard about the

2          commotion that took place, and it was at that

3          time that I was involved as far as looking at

4          the car.

5   Q. At whose request did you look at the car?

6   A. Penny's.

7   Q. Why did Penny ask you to go look at the car?

8   A. We were discussing what took place and she was

9          under the impression the reason he got stopped

10         was one of the back taillights didn't work, and

11         asked us to look at the car.

12   Q. Did you ask her --

13   A. She asked us to check it.

14   Q. Do you know why she asked you?

15   A. Probably because my husband was there and prior

16         to that there was nobody else that could have

17         done it.

18   Q. Saturday or Sunday you went to the house and had

19         a conversation with Mrs. Coviello?

20   A. Correct.

21   Q. Can you tell us what your conversation was, best

22         memory.

23   A. First it was checking on her. She had been

24         going through chemotherapy and we were concerned

1      about her health and stress of this.  In

2      discussing it she had brought up in regards to

3      the car and I think I asked how come he got

4      stopped and she said, They're saying his

5      taillight didn't work or taillight was broken; I

6      don't know exact words.  I didn't know whether

7      she meant the glass was broken or the light

8      didn't work and then she had asked my husband

9      and I if we would go out and check the car.

10  Q.  That's what you did?

11  A.  Yeah.

12  Q.  Where was the car parked?

13  A.  It was parked where it's always was when I go

14      there, parked over to the side off the main

15      driveway.

16  Q.  The driveway on the side of the house?

17  A.  On the side of the house.

18  Q.  And the car was parked there?

19  A.  Yes.

20  Q.  Were the keys in the house or in the car?

21  A.  I don't remember whether she gave them to us.  I

22      know we had the keys.  I don't recall if she

23      give them to us.

24  Q.  What happened?

1   A.  My husband sat in the driver's seat and turned

2       it on to accessory so all the lights were

3       working, stepped on the brake lights, put the

4       directionals on and basically checked out the

5       car as far as the light system goes.  And like I

6       had stated in my letter, we noticed being an old

7       car we were surprised, really, other than

8       needing a paint job it was in good shape for an

9       old Mustang.

10  Q.  Did you and your husband start the car up?

11  A.  No; just put it to accessory.

12  Q.  Did Mrs. Coviello say there was any problem that

13      she was aware of with the car; any problem?

14  A.  No, I'm sorry.  I'm just trying to recall.

15  Q.  Any problem with the car starting, or staying,

16      the ignition, anything you recall?

17  A.  She didn't state there was something wrong and

18      we didn't turn the car on; we had no need to

19      turn the car on.

20  Q.  Before you went out there did she say there was

21      anything as far as a problem with the car?

22  A.  No.

23  Q.  She said -- There was some discussion maybe they

24      stopped him because of a taillight?

VOL. 1 - 15
LILLIAN CLARK

1   A.   Yes.

2   Q.   She didn't say to you the car may not start up

3        or anything like that?

4   A.   No.

5   Q.   So you went out just to look at the lights, as

6        you recall?

7   A.   Correct.

8   Q.   Your husband, you said, put the key on to get

9        the lights on and you were outside the car?

10  A.   I was outside the car.

11  Q.   You looked at the headlight and --

12  A.   Went to both the front and back of the car.

13  Q.   You looked at the brake lights, as well?

14  A.   We tried all the lights.

15  Q.   Anything else you did that you recall?

16  A.   Just going around the car.  We made a note

17       ourselves in discussing that, how

18       well-conditioned the car was for its age.

19  Q.   Did you drive the car at all?

20  A.   No.

21  Q.   When you put your -- you put the lights on, the

22       car was parked and the engine not on?

23  A.   There was no need to put the engine on.

24  Q.   I'm just asking.  You didn't put the brakes on

1       with the engine on as well; correct?

2   A.  No.

3   Q.  How long did you leave the lights on for, if you

4       know?

5   A.  Well, the headlights were on the entire time we

6       were there doing this.  There was, just like I

7       say, enough to check them out, directionals,

8       stepping on the brake, that type of thing.

9   Q.  You did put on the directionals?

10  A.  Correct.

11  Q.  Fair to say you're not an expert in automotive?

12  A.  No.  No.

13  Q.  Did you, yourself, have any discussion with

14      Mr. Coviello since that time you went over to

15      talk to his mother about this episode?

16  A.  Car or the incident?  The incident, no.

17  Q.  He didn't say anything to you about the

18      incident?

19  A.  (Witness nods.)

20  Q.  You have to answer for the record.

21  A.  He was away for I don't know how many weeks or

22      months.  By the time I got to see Jerry it

23      wasn't the topic of conversation, it was more

24      concerned about the health of his mother that we

VOL. 1 - 17
LILLIAN CLARK

1           discussed.

2      Q.   Did you talk about the car at all after that

3           incident with him?

4      A.   Only in reference to this letter; they asked me

5           if I would write a letter to his attorney.

6      Q.   You wrote this shortly after you --

7      A.   Shortly after the incident.

8      Q.   You sent it to the attorney or handed to him?

9      A.   I gave this to -- his mother and I were at

10          Carlson.

11     Q.   Where?

12     A.   Carlson Real Estate, that's where his mother

13          worked.   That's when I hand-delivered the letter

14          to Penny.

15     Q.   Have you testified in any hearing on this case?

16     A.   No.

17     Q.   Has any investigator come to talk to you about

18          this case?

19     A.   No.

20     Q.   Anybody called you?

21     A.   The Attorney Kerner called me in regards to a

22          court date and he was supposed to call me and

23          due to the time he finally called me I didn't

24          appear or he wanted me to appear I was away.

1    Q.   Did he say what he wanted you to testify to?

2    A.   It was in reference to the letter.

3    Q.   Did he say what you should say?

4    A.   No; we didn't go over it.

5    Q.   Anybody else that you talked to about this case?

6    A.   No.

7    Q.   Besides your husband?

8    A.   Obviously, he was there.

9    Q.   Anyone give you -- any other written statements?

10   A.   No.

11   Q.   You haven't testified anywhere else besides

12        today?

13   A.   No.

14   Q.   Okay.  When you talked to Mrs. Coviello, at the

15        time did she describe to you what happened on

16        that night?

17   A.   I must say vaguely.  To tell you what took place

18        the entire incident, I don't -- she --

19   Q.   You weren't there, right?

20   A.   Right.

21   Q.   I'm asking what you recall her telling you.

22   A.   That's what I'm saying.  She said that in

23        regards to the police said that he had a gun,

24        that he had and she said that he didn't.  And

1    that the police had taken all the guns, even toy

2    guns and laid them on a bed and took pictures

3    which he was upset about.

4  Q.  She said he didn't have a gun at all?

5  A.  Not a gun in the house.  The police were saying

6    he was going back and forth and carrying a gun

7    and she said he didn't have a gun.

8  Q.  That's what she told you?

9  A.  Yeah.

10  Q.  Have you learned differently since then?

11  A.  I can honestly tell you I don't know anything

12    about the case except what was in the newspaper.

13  Q.  That brings up a good point.  When did you hear

14    about this incident?

15  A.  It would have been the next day in the Lowell

16    Sun.

17  Q.  Was that September 1st?

18  A.  I don't recall.  Two things: My mother was also

19    in Blair House in Tewksbury and she gets the

20    Lowell Sun.  Up in Merrimac, I don't.  I had

21    another close friend of Penny and I that were

22    involved in her chemotherapy treatments and so

23    forth.  I got a call from Sue, which is the

24    friend of ours, the three of us.  I got a call

1      from Sue and I read it in the paper.  How those

2      incidents took place, I don't recall.

3  Q.  Was it Saturday or Sunday that you read it?

4  A.  I don't recall.

5  Q.  It was after the news article you then called

6      Penny?

7  A.  Yes.

8  Q.  It was after reading the news article --

9  A.  I don't remember if it was after Sue called me

10     or after reading.  Both took place in --

11 Q.  A very short time of --

12 A.  -- each other, yes.

13 Q.  Did you notice any -- I know you said you

14     examined the car, did you look at the car for

15     dents, damage, or scratches, or looking for

16     lights?

17 A.  We weren't necessarily looking for dents; what

18     we noticed was the body of the car was in

19     tremendous shape, great shape for its age.  That

20     I can tell you.  There were no dents on the car.

21     I think we weren't looking for them but then

22     later on recounts of the story from papers that

23     was the one thing that threw me, they were

24     saying in one of the newspapers it was saying

1      that he had hit a police car.  He couldn't have

2      because there would have been damage on the car

3      and there was no damage on the car.

4    Q.  You said you had not looked at the car prior to

5      that date Penny insisted you look at it?

6    A.  I saw the car all the time.  I was at Penny's

7      all the time.

8    Q.  You didn't examine it?

9    A.  No.

10   Q.  You didn't know what the car looked like before

11     in comparison to that day?

12   A.  No.  No need to look at it.

13           MR. SILVERFINE:  Okay.  I have nothing

14     further.  Mr. Coviello?

15     CROSS-EXAMINATION

16   Q.  (By Mr. Coviello)  You had no reason to cross --

17     to examine my car prior to the date of the

18     incident; is that correct?

19   A.  That's correct.

20   Q.  After you did examine my car; is that correct?

21   A.  Yes.

22   Q.  No matter what it looked like beforehand, after

23     the incident you looked at it and it wasn't

24     smashed up, was it?

1   A.  No.

2   Q.  There were no dents or bashes?

3   A.  No.

4   Q.  You're not certified as an auto mechanic; is

5       that correct?

6   A.  No.

7   Q.  You have worked on cars and you do know how to

8       do work on cars, general work on cars?

9   A.  Yes, I do.

10  Q.  You're not a licensed electrician, are you?

11  A.  No.

12  Q.  You do know when a light is on and a light is

13      off, don't you?

14  A.  I certainly do.

15          MR. COVIELLO:  Okay.

16          MR. SILVERFINE:  Thank you.

17          (Whereupon the deposition of Lillian Clark

18      concluded at 12:45 p.m.)

19

20

21

22

23

24

VOL. 1 - 24
LILLIAN CLARK

Commonwealth of Massachusetts

I, June N. Poirier, Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 28th day of September, 2005, the deponent herein, who was duly sworn by me; that the ensuing examination upon oath of the said deponent was reported stenographically by me and transcribed into typewritten form under my direction and control; and that the within transcript is a true record of the questions asked and the answers given at said deposition, to the best of my knowledge, skill and ability.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or financially interested in the outcome of the action.

IN WITNESS WHEREOF I have hereunto set

my hand and affixed my seal of office this

20 day of October , 2005.

June N. Poirier, Notary Public
Commonwealth of Massachusetts
My Commission Expires:
June 23, 2011

VOL. 1 - 25
LILLIAN CLARK

## ERRATA SHEET

Date of Deposition:  September 28, 2005

Case Name:  Coviello v. Town of Chelmsford

Deponent's Name: Lillian Clark

         I, the undersigned, do hereby certify that I have read the foregoing deposition transcript and that to the best of my knowledge, said deposition transcript is true and accurate (with the exceptions of the following changes listed below):

                _____
                LILLIAN CLARK

             Dated_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____

Page No.___ Line No.___ Correction_____